Alexis BARRERA–ECHAVARRIA, Petitioner–Appellee,

v.

Richard H. RISON, Warden, Respondent–Appellant.

No. 93–56682.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 20, 1994.

Decided Jan. 12, 1995.

Emily A. Radford and Lauri Steven Filppu, U.S. Dept. of Justice, Washington, DC, for respondent-appellant.

Mark D. Kemple and Karen N. Fredericksen, Gibson, Dunn & Crutcher, Los Angeles, CA, for petitioner-appellee.

Lucas Guttentag, Ann Parrent, New York City, for amici curiae, American Civil Liberties Union, American Immigration Law Foundation/Legal Action Center, Mexican American Legal Defense and Educ. Fund, and Asian American Legal Defense and Education Fund.

Paul Hoffman (and Bruce Hall and Cassondra Williams, Law Students), Los Angeles, CA, for amicus curiae, ACLU of Southern California.

Charles D. Weisselberg, Michael J. Brennan, Dennis E. Curtis, Carrie L. Hempel (and Guy C. Galambos, Seth M.M. Stodder and Lesley D. Young, Law Students), Los Angeles, CA, for amici curiae, Nat. Legal Aid and Defender Ass'n, National Ass'n of Criminal Defense Lawyers, and California Attorneys for Criminal Justice.

Before WALLACE, Chief Circuit Judge, HUG, PREGERSON, HALL, WIGGINS, BRUNETTI, THOMPSON, LEAVY, FERNANDEZ, RYMER, and KLEINFELD, Circuit Judges.

Opinion by Judge HALL, Dissent by Judge PREGERSON.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Alexis Barrera–Echavarria is an alien who arrived in the United States in 1980 and was ordered excluded and deported in 1985. His deportation has not been possible, however, because neither his country of origin, Cuba, nor any third country, will accept him. With the exception of one brief period in 1992 when Barrera was released on immigration

parole, he has been detained on behalf of the Immigration and Naturalization Service ("INS") in a variety of prisons since 1985.

In 1989, Barrera instituted the present habeas corpus action, arguing that the Attorney General lacks statutory and constitutional authority to detain him indefinitely when it is clear that his deportation cannot be effected within the foreseeable future, and that his continued detention violates rules of international law which have binding domestic force.[1] After more than four years of proceedings, the district court granted the writ of habeas corpus, ordering the government to release Barrera on immigration parole. On appeal by the government, a divided panel of this court affirmed.[2] A majority of the active, nonrecused judges of this court voted to rehear the case en banc. We now reverse.

### FACTS

In December 1979, Barrera was jailed in Cuba on a theft charge. While he was awaiting trial, the Mariel boatlift began and Barrera was sent to the United States by the Cuban government. On May 29, 1980, he arrived in Key West, Florida, where he was detained by immigration authorities. Along with the vast majority of the more than 120,000 Cubans who came to the United States, Barrera was released on immigration parole a few months after arriving, pending exclusion proceedings.

After hearings, Barrera was formally denied admission to the United States and ordered excluded and deported in May 1985. As is the case with many of the Mariel Cubans, the Cuban government has consistently refused to readmit Barrera and, as far as the record shows, no third country will take him. He is thus an excluded alien whose deportation is not practicable.

Barrera appears from the record to be an unskilled and somewhat unstable individual, with little formal education. His schooling apparently ended with the sixth grade in Cuba. Since arriving in the United States, he has only sporadically taken advantage of educational opportunities, including Bible study classes and 56 hours of English classes while in Lompoc prison.

Barrera's work history is limited and he appears to have few marketable skills. He worked as a brick mason in Cuba and upon his initial parole into the United States in 1980, he held a number of menial, unskilled agricultural and factory jobs. While he has held some prison jobs, he has a "poor work record."

The last time the government approved Barrera for parole, it found it extremely difficult to place him in an appropriate program; the INS approved his parole release in late 1990 but could not find a program willing to accept him until January 1992. The difficulty resulted in part from the special needs posed by his mental and social problems. A prison psychiatrist at Lompoc determined that Barrera's mental functioning "appeared fairly normal," but concluded that he exhibited traits "attributable to an antisocial personality disorder." Further psychological testing at St. Elizabeth's Hospital in late 1991 found that Barrera has no apparent structural brain damage, although there are other neurological anomalies which were not precisely diagnosed. The evaluation confirmed a diagnosis of "Borderline Intellectual Functioning," and found an "inability to make appropriate judgments" and develop "strategies in approaching the tasks that he was asked to undertake." The report concluded that "Mr. Barrera's functional cognitive deficits and his impairment in social relations, his oscillations between anxiety, depression and irritability, appear best explained by the interaction of his limited intellectual functioning, and his basic personality structure and features."

The Lompoc doctor stressed that if paroled, Barrera must be placed in a "highly structured, well-supervised halfway house

---

1. Barrera's initial petition also requested review of the decision of the Board of Immigration Appeals ("BIA") denying his request for asylum and withholding of deportation. In a January 14, 1992 Order, the district court denied habeas corpus relief on those grounds, finding that the BIA's decisions were supported by substantial evidence. Barrera has not appealed from that order.

2. The panel opinion, which we hereby vacate, was reported at 21 F.3d 314 (9th Cir.1994).

program." The doctors at St. Elizabeth's concurred, finding he needed "high levels of structure, opportunities for group and individual therapy, education and vocational training[, as well as] intensive acculturation experience. This process should be individualized to meet both his needs and adaptive capacity, with close monitoring of his social behavior prior to any release to the community."

The accuracy of these evaluations can perhaps be surmised from the record of Barrera's conduct since he arrived in the United States. Almost immediately after being paroled in 1980, Barrera began a long series of encounters with the law. In May 1981, he was arrested in Miami for grand theft auto. In August 1981, he was arrested for retail theft and armed robbery. June of 1982 saw an arrest for strong arm robbery, and the following month Barrera was charged with armed robbery and resisting arrest. While the final dispositions of all these charges are unclear from the record, Barrera was apparently not convicted of any of them.

Barrera pleaded guilty in March 1983, however, in Dade County Circuit Court, to two counts of armed robbery with a firearm. He was sentenced to two concurrent jail terms of 230 days. Apparently not long after leaving jail, he was arrested again for burglary, in May 1983.

In July 1983, Barrera was found guilty after trial of burglary and petit theft. He was sentenced to two years in Florida state prison. While in prison, he had a "record of assaults and behav[i]oral problems," resulting in administrative confinement, transfers, and protective custody.

The INS revoked Barrera's parole in January 1985 and, upon finishing his state sentence, he was transferred to the federal prison in Atlanta, where a number of Mariel Cubans were being detained. His disciplinary record in Atlanta was no better than in Florida, and Barrera was written up several times for destroying government property, setting fires, and fighting with other inmates.

Under the Cuban Review Plan, 8 C.F.R. §§ 212.12–13, a set of regulations governing the standards and procedures used by the INS to evaluate parole possibilities for detained Mariel Cubans, Barrera has been considered for parole at least annually since 1985. After being denied release on several occasions, he was paroled briefly in 1992, to a halfway house in the Los Angeles area. There are reports of several minor disciplinary problems at the halfway house, and Barrera's parole was revoked after six months when he was arrested for allegedly sexually assaulting another halfway house resident at knife point on two separate occasions. The latter charges were dropped because the victim became mentally incompetent and was unable to testify.

According to the record, Barrera was last reviewed for immigration parole in December 1992. In February 1993, parole was denied because the INS could not conclude that Barrera would remain nonviolent and would not pose a threat to the community.

## DISCUSSION

I. *The Attorney General has statutory authority to detain indefinitely an undeportable, excludable alien.*

The district court found that the Attorney General does not have statutory authority indefinitely to detain undeportable, excludable aliens. This court reviews questions of statutory interpretation de novo. *Braun v. INS,* 992 F.2d 1016, 1018 (9th Cir.1993). The reviewing court should, however, give deference to an agency's interpretation of the statutes it administers. *Mason v. Brooks,* 862 F.2d 190, 192 (9th Cir.1988); *see also Fernandez v. Brock,* 840 F.2d 622, 631 (9th Cir.1988) (where statutory language is ambiguous, court must "defer to the agency's interpretation of the statute if it 'is based on a permissible construction of the statute'" and must "not substitute [its] own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency") (quoting *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)). In addition, when Congress is aware of an agency's interpretation of a statute and takes no action to correct it while amending other portions of the statute, it may be inferred that

the agency's interpretation is consistent with congressional intent. *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 535, 102 S.Ct. 1912, 1925, 72 L.Ed.2d 299 (1982); *Greenhorn Farms v. Espy,* 39 F.3d 963, 965 (9th Cir.1994).

The Attorney General's authority in this area derives from the intersection of several statutory provisions:

8 U.S.C. § 1225(b) (1988) mandates that the Attorney General "shall ... detain[e] for further inquiry" any alien "who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land."

Exclusion proceedings are governed by 8 U.S.C. § 1226 (1988 & Supp. V 1993).

The Attorney General may, pursuant to 8 U.S.C. § 1182(d)(5)(A) (Supp. V 1993), "in [her] discretion parole into the United States temporarily under such conditions as [she] may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States ... and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled ..."

Finally, 8 U.S.C. § 1227(a)(1) (1988) provides that "[a]ny alien ... arriving in the United States who is excluded under this chapter, shall be immediately deported ... unless the Attorney General, in an individual case, in [her] discretion, concludes that immediate deportation is not practicable or proper." Section 1227(a)(1) also states that "[t]he cost of the maintenance including detention expenses and expenses incident to detention" of excluded aliens awaiting deportation are generally to be borne by "the owner or owners of the vessel or aircraft on which he arrived ..."

Both Barrera and the government press statutory construction arguments based upon inferences to be drawn from congressional silence. It is indisputable that these provisions authorize some detention of aliens who are subject to exclusion proceedings or are awaiting deportation after being ordered excluded. *See, e.g.,* 8 U.S.C. § 1227(a)(1) (providing for the allocation of "detention expenses and expenses incident to detention" of excluded aliens). Barrera concedes as much. The parties disagree, however, over whether the statutes permit the *prolonged* detention of such aliens.

Simplifying somewhat, Barrera's contention is that because § 1227(a)(1) expressly addresses only detention pending "immediate deportation," Congress has conferred no authority to detain excluded aliens once it becomes clear that immediate deportation is not possible. The government counters that because the relevant statutes place no *limit* on the length of detention, it may detain indefinitely pending deportation.

■ The statutory language compels neither conclusion. We find, however, that the overall structure of the provisions relating to excludable aliens *assumes* that the Attorney General has authority to detain aliens who are subject to exclusion proceedings or who have been ordered excluded unless she decides, in her discretion, to grant parole. Executive practice with respect to the Mariel Cubans over the past 14 years has certainly comported with this interpretation. Because the Attorney General's construction of the relevant statutory provisions is reasonable and Congress has not acted to restrict detention authority despite being well aware of executive practice, we have little difficulty concluding that Barrera's continuing detention is authorized by statute.

■ Barrera's argument would effectively require the Attorney General to parole excludable aliens who cannot be deported within a "reasonable" time.[3] While the exclusion

---

3. Barrera attempts to frame his argument as an attack on his detention, and not a request for parole. The distinction, however, seems meaningless. While the district court's opinion speaks in terms of illegal detention, for example, its order in practical terms requires the government to release Barrera on parole. *See* October 7,

1993 Memorandum Opinion and Order at 24 (government must "release Barrera into a halfway house or some other form of supervised release program ... *unless* the Attorney General can show that his deportation is imminent.") (emphasis in original). This result illustrates the

statutes do not expressly authorize prolonged detention, a construction requiring parole if deportation cannot be rapidly effected would upset a scheme in which we have noted that an excludable alien "may only enter the United States temporarily at the discretion of the Attorney General, unless he can establish independent statutory grounds authorizing his admission." *Mason,* 862 F.2d at 192. Under § 1182(d)(5)(A), Congress has vested in the Attorney General the discretion to grant immigration parole, but only "for emergent reasons or for reasons deemed strictly in the public interest." This language certainly suggests that for excludable aliens, Congress intended that parole be the exception and not the rule. *See Mason,* 862 F.2d at 194 ("The legislative history of the parole provision indicates that Congress intended that temporary admission be granted infrequently."); *Amanullah v. Nelson,* 811 F.2d 1, 6 (1st Cir.1987) (same). Because an alien who has not been paroled must by definition be detained, and because Congress has certainly been aware that deportation cannot in all cases be immediately effected, it seems difficult not to conclude that the statutory scheme implicitly authorizes prolonged detention.

Barrera relies upon § 1227(a)(1)'s command that an excluded alien be "immediately deported" as a limit on the permissible length of detention. That requirement, however, is qualified in the same sentence by the Attorney General's power to conclude "that immediate deportation is not practicable or proper." The "immediate deportation" provision of § 1227 does not purport to alter the Attorney General's parole discretion under § 1182 by requiring parole when deportation is delayed, and we see no reason to read such an effect into the statute. *Accord Gisbert v. U.S. Att'y Gen.,* 988 F.2d 1437, 1443 (5th Cir.), *amended,* 997 F.2d 1122 (1993) ("The language of the statute does not require the Attorney General to parole any alien, nor does it mandate parole on any particular finding or findings or place any substantive restriction on the authority to deny parole.").

We draw further support for our conclusion from § 1182(d)(5)(A)'s provisions regarding revocation of parole:

> . . . when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

This language suggests that excludable aliens are to be held in "custody" whenever the Attorney General finds that parole is not appropriate. The "any other applicant" phrase further implies that Congress envisioned that the exclusion and deportation of most aliens would take place with the alien in custody, not on parole. Thus, this section reinforces the conclusion that Congress intended that detention be the "default" choice, and parole a discretionary exception.

Barrera attempts to support his position by pointing to an amendment to the immigration statutes since the Mariel boatlift. Section 1226(e), enacted in 1990, provides that the Attorney General may only parole an excludable aggravated felon if he is found *not* to be a threat to the community. In *Alvarez–Mendez v. Stock,* this court held that § 1226(e) expressly authorized the alien's prolonged detention and was constitutional. 941 F.2d 956, 961–63 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 127, 121 L.Ed.2d 82 (1992).

Barrera argues that § 1226(e) should be interpreted as a narrow grant of power to the Attorney General to detain only aggravated felons, and as further proof that she has no authority to detain indefinitely aliens like Barrera who are not aggravated felons, absent similar express statutory authorization. In *Gisbert,* however, the Fifth Circuit rejected the argument now pressed by Barrera, applying and extending instead our decision in *Alvarez–Mendez.* The Fifth Circuit concluded that § 1226(e) is properly interpreted "as a limitation on the Attorney General's power to *release,* or *not* to detain, and is not written as a grant of or limitation on [her] power to detain. Rather, it appears to

practical impossibility of separating the deten-

tion and parole issues.

assume such a power." *Gisbert,* 988 F.2d at 1446. We agree with the Fifth Circuit that § 1226(e) supports the conclusion that the Attorney General has implied authority to detain.

Finally, it is significant that Congress has for at least four decades been aware of instances of long-term detention of excludable aliens by the executive branch. Perhaps the most famous early example resulted in the leading Supreme Court decision in this field, *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953). In that case, the Supreme Court upheld the detention of an excludable alien on Ellis Island for almost two years, and Mezei in fact remained in detention for four years before being released by the executive branch. *See Trop v. Dulles,* 356 U.S. 86, 102 n. 36, 78 S.Ct. 590, 599 n. 36, 2 L.Ed.2d 630 (1958).

More recently, the long-term detention of many of the Mariel Cubans has been a matter of great public and congressional concern. Prison disturbances by Cuban detainees in 1984, 1987, and 1991 have focussed public spotlights on the continued detention of hundreds of Mariel refugees. And we must assume that Congress is aware of the numerous cases addressing the statutory and constitutional authority of the government to detain the Mariel Cubans.[4] During the past 15 years, in fact, Congress has held many hearings relating in whole or in part to the detention of the Mariel Cubans[5] and has amended the immigration laws, including

4. All but one of the circuits to have addressed the question of the Attorney General's authority to detain the Mariel Cubans indefinitely pending deportation have found implicit statutory power. *See Gisbert,* 988 F.2d at 1446; *Fernandez–Roque v. Smith,* 734 F.2d 576, 580 & n. 6 (11th Cir. 1984); *Palma v. Verdeyen,* 676 F.2d 100, 104 (4th Cir.1982). In *Rodriguez–Fernandez v. Wilkinson,* 654 F.2d 1382, 1389 (10th Cir.1981), the Tenth Circuit held to the contrary that the immigration laws did not grant implicit power to detain the Mariel Cubans indefinitely. That conclusion is against the weight of authority and, in our opinion, incorrect. It is also distinguishable as one of the first cases dealing with detention of the Mariel Cubans, shortly after their arrival. *See Gisbert,* 988 F.2d at 1446–47. The Tenth Circuit based its conclusion that Congress had not implicitly authorized indefinite detention in large part on the observation that "[t]here is no evidence to suggest that prior to the instant case a significant number of excludable aliens have been physically detained for periods of long duration." 654 F.2d at 1389. Even assuming that was true in 1981, the observation is no longer accurate 13 years later: prolonged detention of the Mariel Cubans has been well-known to Congress, and that body has not acted to limit the Attorney General's authority to detain. *Rodriguez* was also decided before the government promulgated its detailed regulations governing parole review for the Mariel Cubans. 8 C.F.R. §§ 212.12 & 212.13. Recent district court decisions within the Tenth Circuit have distinguished *Rodriguez* and followed *Alvarez–Mendez* and *Palma. See Rodriguez v. Thornburgh,* 831 F.Supp. 810, 812 (D.Kan.1993); *Barrios v. Thornburgh,* 754 F.Supp. 1536, 1540 (W.D.Okla.1990).

5. *See, e.g., Cuban Detainees and the Disturbance at the Talladega Federal Prison, Hearing Before the Subcomm. on Intellectual Property and Judicial Administration of the House Judiciary Comm.,* 102d Cong., 1st Sess. (1991); *Recent Developments in U.S.–Cuban Relations: Immigration and Nuclear Power, Hearing Before the Subcomm. on Western Hemisphere Affairs of the House Foreign Affairs Comm.,* 102d Cong., 1st Sess. (1991); *Mariel Cuban Detainees, Hearing Before the Subcomm. on Immigration, Refugees, and International Law of the House Judiciary Comm.,* 100th Cong., 2d Sess. (1988); *Mariel Cuban Detainees: Events Preceding and Following the November 1987 Riots, Hearing Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Judiciary Comm.,* 100th Cong., 2d Sess. (1988); *Federal Prison Policy, Hearing Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Judiciary Comm.,* 100th Cong., 1st Sess. (1987); *Atlanta Federal Penitentiary, Hearing Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Judiciary Comm.,* 99th Cong., 2d Sess. (1986); *Immigration Emergency Powers, Hearing Before the Subcomm. on Immigration and Refugee Policy of the Senate Judiciary Comm.,* 97th Cong., 2d Sess. (1982); *Detention of Aliens in Bureau of Prison Facilities, Hearing Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Judiciary Comm.,* 97th Cong., 2d Sess. (1982). At these hearings, various congressional committees heard testimony regarding the long-term detention of Mariel Cubans in federal prisons, the government's unsuccessful efforts to return many of the Mariels to Cuba, and the prison disturbances at Atlanta in 1984 and 1987, Oakdale in 1987, and Talladega in 1991. Several witnesses and members of Congress expressed concern that long-term detention was inhumane or even unconstitutional. As best we can tell, however, *no one* appears to have suggested that the executive branch does not have the *statutory authority* to detain the Mariel Cubans.

those dealing with excludable aliens and parole, on several occasions.[6] This legislative history confirms our interpretation that long-term detention is authorized under the current statutes. *North Haven Bd. of Educ.*, 456 U.S. at 535, 102 S.Ct. at 1925.

Reading a time limit on detention into § 1227 would risk frustrating the government's ability to control immigration policy and relations with foreign nations. A judicial decision requiring that excludable aliens be released into American society when neither their countries of origin nor any third country will admit them might encourage the sort of intransigence Cuba has exhibited in the negotiations over the Mariel refugees. *See, e.g., Jean v. Nelson*, 727 F.2d 957, 975 (11th Cir.1984) (en banc) ("[T]his approach would ultimately result in our losing control over our borders. A foreign leader could eventually compel us to grant physical admission via parole to any aliens he wished by the simple expedient of sending them here and then refusing to take them back."), *aff'd*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). In an area with sensitive foreign policy implications, we must hesitate to interpret an ambiguous statutory scheme as requiring such a result. We therefore hold that the Attorney General's detention of Barrera has been authorized by statute.

II. *Barrera's detention is constitutional.*

Barrera further claims that his prolonged detention, if authorized by statute, is unconstitutional. He relies primarily on a line of cases distinguishing permissible regulatory detention from unconstitutional punishment, arguing that his detention in federal prisons almost continuously since 1985 falls on the punishment side of the line and violates his right to due process. *See, e.g., Foucha v.*

*Louisiana*, —— U.S. ——, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992); *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *Schall v. Martin*, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984). Because he is not serving a sentence for any crime and is not awaiting trial on any criminal charges, the argument goes, the government cannot continue to detain him. The district court agreed, holding that Barrera's detention for more than a "reasonable" time after it became clear he could not be deported in the immediate future "at some point" [7] became unconstitutional punishment.

■ We do not view the constitutional question in these terms, however. Consistent with the Supreme Court's decision in *Shaughnessy v. Mezei*, and in light of the annual parole reviews provided under the Cuban Review Plan regulations, we find that Barrera has no constitutional right to immigration parole and, therefore, no right to be free from detention pending his deportation. The punishment cases he relies upon are therefore irrelevant to our decision.

■ The Supreme Court has consistently recognized that "our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission ... and those who are within the United States after an entry, irrespective of its legality. In the latter instance, the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.'" *Leng May Ma v. Barber*, 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958) (quoting *Mezei*, 345 U.S. at 212, 73 S.Ct. at 629). In *Mezei*, the Supreme Court noted that "aliens who have once passed through our gates, even illegally, may be

---

**6.** By way of example, § 1182(d)(5)(A) was amended by the Immigration Act of 1990, Pub.L. No. 101–649, § 202(b), 104 Stat. 4978, 5014 (1990) ("1990 Immigration Act"). Section 1226 was amended by § 504 of the 1990 Immigration Act, 104 Stat. at 5049–50, and by the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub.L. No. 102–232, § 306(a)(5), 105 Stat. 1733, 1751 (1991) ("1991 Immigration Amendments"). Section 1227 was amended by the Act of Dec. 29, 1981, Pub.L. No. 97–116, § 7, 95 Stat. 1611, 1615–16 (1981); by

the Immigration Technical Corrections Act of 1988, Pub.L. No. 100–525, § 4, 102 Stat. 2609, 2615 (1988); § 543 of the 1990 Immigration Act, 104 Stat. at 5057–58; and § 306(c)(4) of the 1991 Immigration Amendments, 105 Stat. at 1752.

**7.** The district court did not define "at some point." It presumably falls somewhere between the three years detention upheld in *Alvarez–Mendez* and the eight years found by the district court to be unconstitutional here.

expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." 345 U.S. at 212, 73 S.Ct. at 629. An excludable alien, however, has no procedural due process rights regarding his admission or exclusion and thus "stands on a different footing: 'Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'" *Id.* (quoting *Knauff v. Shaughnessy,* 338 U.S. 537, 544, 70 S.Ct. 309, 313, 94 L.Ed. 317 (1950)). *See also Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982) ("[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application ... [H]owever, once an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly.").

■ While it is therefore clear that excludable aliens have no procedural due process rights in the admission process, the law is not settled with regard to nonprocedural rights. Some of the cases involving excludable aliens suggest that they do enjoy certain substantive constitutional rights. *See, e.g., Wong Wing v. United States,* 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896) (excludable aliens may not be punished at hard labor without due process of law); *Lynch v. Cannatella,* 810 F.2d 1363, 1370, 1373–74 (5th Cir.1987) (excludable aliens "do not possess a due process right to remain free of incarceration pending their deportation," but are entitled under Fifth and Fourteenth Amendments "to be free of gross physical abuse at the hands of state or federal officials"); *United States v. Henry,* 604 F.2d 908, 914 (5th Cir.1979) ("[A]n alien who is within the territorial jurisdiction of this country, whether it be at the border or in the interior ... is entitled to those protections guaranteed by the Fifth Amendment in criminal proceedings which would include the *Miranda* warning."). While excludable aliens

might, therefore, enjoy some constitutional protections, we find that applicable Supreme Court precedent squarely precludes a conclusion that they have a constitutional right to be free from detention, even for an extended time.

Almost a century ago, the Court recognized the validity of detaining excludable aliens pending deportation. In *Wong Wing,* the Court found it "clear that detention, or temporary confinement, as part of the means necessary to give effect to the provisions for the exclusion or expulsion of aliens would be valid." 163 U.S. at 235, 16 S.Ct. at 980. This conclusion was compelled by the observation that it "would be [in] vain if those accused could not be held in custody pending the inquiry into their true character and while arrangements were being made for their deportation." *Id.*

In *Mezei,* the Court addressed a situation similar in many respects to that in which Barrera finds himself, and upheld the long-term detention of an excluded alien. Mezei was an excludable alien [8] who was denied admission to the United States under the Passport Act on national security grounds and ordered excluded and deported. When no country would take him, he was detained on Ellis Island for over 21 months. Upon review of Mezei's application for a writ of habeas corpus, the Supreme Court held that he was "deprive[d] ... of [no] statutory *or constitutional right*" by virtue of his continuing exclusion and detention. 345 U.S. at 215, 73 S.Ct. at 631 (emphasis added).

Barrera argues that *Mezei* is inapposite because it involved only the legality of continued *exclusion* under the special provisions of the Passport Act, and not the legality of Mezei's *detention.* This interpretation, however, is incorrect: while the Court spoke in terms of exclusion, *see, e.g., id.* ("[w]e do not think that [Mezei's] continued exclusion" is illegal), its holding necessarily included a determination that Mezei's *detention* was legal

---

8. Mezei had in fact resided in the United States for 25 years, before leaving the country for a 19 month stay in Hungary. Upon his return, he was excluded and denied readmission. 345 U.S. at 208, 73 S.Ct. at 627. The Court treated him as "an entrant alien or assimilated to [that] status for constitutional purposes," holding that he did not benefit from the greater constitutional protections afforded resident aliens. *Id.* at 214, 73 S.Ct. at 630 (internal quotation and citation omitted) (alteration in original).

as well. *See Jean*, 727 F.2d at 970. *Mezei* therefore suggests that the Court found that excludable aliens simply enjoy no constitutional right to be paroled into the United States, even if the only alternative is prolonged detention.

Such a result is conceptually defensible. *Mezei* established what is known as the "entry fiction," which provides that "[a]lthough aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country." *Gisbert*, 988 F.2d at 1440; *see also Lynch*, 810 F.2d at 1370; *Garcia–Mir v. Smith*, 766 F.2d 1478, 1484 (11th Cir.1985), *cert. denied*, 475 U.S. 1022, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986); *Jean*, 727 F.2d at 964. Noncitizens who are outside United States territories enjoy very limited protections under the United States Constitution. *See, e.g., United States v. Verdugo–Urquidez*, 494 U.S. 259, 274–75, 110 S.Ct. 1056, 1066, 108 L.Ed.2d 222 (1990) (Fourth Amendment not applicable to search in Mexico of Mexican citizen's home); *Johnson v. Eisentrager*, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (Fifth Amendment not applicable to aliens outside United States territory). Because excludable aliens are deemed under the entry doctrine not to be present on United States territory, a holding that they have no substantive right to be free from immigration detention reasonably follows.

We note that this case does *not* involve, as Barrera contends, the constitutionality of "indefinite" or "permanent" detention with no prospect of release. Because he was in custody in December 1987, Barrera received a special one-time review by a Justice Department panel comprised of non-INS officials. *See* 8 C.F.R. § 212.13. Further, under the Cuban Review Plan, Barrera's case continues to be reviewed at least annually to determine if he meets established criteria for

granting parole. *See id.* § 212.12. At his annual reviews, Barrera can be assisted by a representative and has the opportunity to present oral and written information in support of his release. *Id.* § 212.12(d)(4). Factors considered in these reviews include participation in educational and vocational programs, ties to the community, criminal and disciplinary records, psychological evaluations, and other information concerning Barrera's fitness to enter American society. *Id.* § 212.12(d)(3). Thus, Barrera has the opportunity on an annual basis to show that since the previous review he has changed his behavior and would no longer constitute a danger to society if paroled.

When viewed in this light, as a series of one-year periods of detention followed by an opportunity to plead his case anew, we have no difficulty concluding that Barrera's detention is constitutional under *Mezei*.

III. *Barrera's detention does not violate any rule of international law enforceable by this court against the United States government.*

Barrera's final claim is that his continued detention violates rules of international law against "prolonged arbitrary detention," which are binding upon the United States. *See The Paquette Habana*, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900). The status of international law on this issue and the legality of American policy under that law are not as clear as Barrera and his *amici* would suggest. *See, e.g., Palma*, 676 F.2d at 106 n. 5 (while international law prohibits "prolonged arbitrary detention," American detention of Mariel Cubans is not "arbitrary" because parole decisions are made according to specific criteria and reviewable by courts). Even assuming such a rule of international law exists, however, Barrera cannot avail himself of its protections.[9]

International law can be binding upon the United States in domestic courts. *The Paquette Habana*, 175 U.S. at 700, 20

---

9. The district court found it unnecessary to rule on this argument in light of its statutory and constitutional holdings. Barrera did not cross-appeal on this issue, although he does briefly argue it in his brief in this court and *amicus*

ACLU of Southern California devotes its entire brief to the subject. Ordinarily, Barrera's failure to appeal the issue would constitute a waiver. Because he raised it below and argues it in his brief, however, we can reach the question.

S.Ct. at 299. It is well-settled, however, that international law controls only "where there is no treaty, and no controlling executive or legislative act or judicial decision." *Id.; see also Alvarez–Mendez,* 941 F.2d at 963 (international law is displaced by "a properly enacted statute, provided it be constitutional, even if that statute violates international law"). *Alvarez–Mendez* held that the Attorney General's authority under 8 U.S.C. § 1226(e) to detain excludable aliens convicted of aggravated felonies displaced any possible contrary rule of international law, so that international law did not require the detainee's release. *Id.*

██ As discussed in part I above, the Attorney General has statutory authority to detain Barrera. Given our construction of the statute as consistent with Barrera's detention, along with the Attorney General's decision to detain him and the support of the Supreme Court's holding in *Mezei,* we hold that international law is displaced in this area as well, by a combination of "controlling acts" of the legislative, executive, and judicial branches. *Accord Gisbert,* 988 F.2d at 1447–48 (immigration statutes, Attorney General actions, and *Mezei* suffice to displace international law); *Garcia–Mir v. Meese,* 788 F.2d 1446, 1453–55 (11th Cir.) (executive acts in detaining excludable Mariel Cubans and the Court's decision in *Mezei* "constitute a sufficient basis for ... finding that international law does not control"), *cert. denied,* 479 U.S. 889, 107 S.Ct. 289, 93 L.Ed.2d 263 (1986).

*CONCLUSION*

The judgment of the district court is REVERSED, and the case is REMANDED to the district court with instructions to DISMISS the petition.

PREGERSON, Circuit Judge, dissenting:

The majority concludes that the Attorney General has the statutory authority to detain indefinitely an excludable alien who practicably cannot be deported. Because no statute grants such authority, and because I believe that the indefinite detention of an excludable alien violates due process, I dissent.

1. LACK OF STATUTORY AUTHORITY

As Judge Noonan pointed out in the decision of the three-judge panel, 21 F.3d 314 (9th Cir.1994), there is no statute that explicitly authorizes the Attorney General to detain indefinitely an excludable alien who practicably cannot be deported. The majority argues that this authority is *implicit.* Drawing from an amalgam of immigration statutes, the majority cobbles together the semblance of such authority.

But these statutes only authorize the Attorney General to detain excludable aliens *for a period.* 8 U.S.C. § 1225(b) allows the detention of aliens who appear to be excludable for "further inquiry." After such inquiry, the detention under § 1225(b) has served its purpose, and further detention is not authorized. 8 U.S.C. § 1182(d)(5)(A) provides for the return of an excludable alien on parole to "the custody from which he was paroled." The custody from which Barrera was paroled was detention pending deportation, not permanent detention. Finally, 8 U.S.C. § 1227(a)(1) speaks only to the allocation of the costs of detaining an excludable alien who practicably cannot be deported. Nowhere do these statutes give the Attorney General any license to extend the period of detention into perpetuity.

The fact that Congress failed to pass legislation explicitly limiting the duration of detention of excludable aliens should not be taken as its approval of detention for an indefinite period. In arguing for indefinite detention, the Government relies on *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953). However, Mezei, also an excludable alien, whom no country would accept, had been detained on Ellis Island for two years when the Supreme Court heard his case; afterwards, he was detained for two more years before being released and allowed to enter the United States. I am not aware of any case that involved the imprisonment for more than eight years of an excludable alien who has not been convicted of any crime.

The majority attempts to re-characterize Barrera's indefinite confinement as "a series of one-year periods of detention followed by an opportunity to plead his case anew."

However, the reality is that the INS can successively deny parole, as it has in Barrera's case. Practically, Barrera's detention is indefinite.

Because there is no explicit statutory authority that allows Barrera's indefinite detention, the majority argues that limiting the time period of the detention of an excludable alien would invite foreign leaders to "compel us to grant physical admission via parole to any aliens he wished by the simple expedient of sending them here and then refusing to take them back." (Citations omitted.) This argument overlooks the fact that foreign leaders such as Fidel Castro simply could care less whether we imprison or set free their former imprisoned citizens. The prolonged detention of Mariel Cubans has had no deterrent effect on Castro's mission to frustrate our foreign policy. In the meantime, individuals such as Barrera have languished in our prisons after having completed their sentence for any previously committed offenses.

## 2. UNCONSTITUTIONALITY OF PROLONGED DETENTION

The majority summarily disposes of Barrera's constitutional challenge to his confinement by concluding that excludable aliens do not possess any due process rights. The majority cites *Mezei*, 345 U.S. at 212, 73 S.Ct. at 629, for support. However, in *Mezei*, the Supreme Court explained that the Attorney General may exclude aliens without a hearing when the exclusion is based on confidential information, the disclosure of which may be prejudicial to the public interest. *Id.* at 210–11, 73 S.Ct. at 628. No such national security concerns are implicated in Barrera's case.

Moreover, the Supreme Court almost 100 years ago held that excludable aliens have some due process rights. In *Wong Wing v. United States*, 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896) the Court held that excludable aliens may not be imprisoned at hard labor without due process of law. More recently, in *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979) the Court clearly stated that "civil commitment *for any purpose* constitutes a significant deprivation of liberty that requires due process protection." (Emphasis added.)

In *United States v. Salerno*, 481 U.S. 739, 747, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987), the Supreme Court held that detention constitutes punishment if the detention appears "excessive" in relation to any alternative purpose. *See also Foucha v. Louisiana*, — U.S. —, —, 112 S.Ct. 1780, 1784, 118 L.Ed.2d 437 (1992) (even if the initial commitment was permissible, it cannot constitutionally continue after that basis no longer exists). As Judge Noonan reasoned, eight years of imprisonment is excessive for someone who has not committed any federal nor state crimes in that period.

The majority points out that courts have long held that excludable aliens may be detained pending deportation. However, because Barrera practicably cannot be deported, the purported purpose of his detention no longer obtains. The Government does not need to keep Barrera in custody to conduct an "inquiry into [his] true character," *Wong Wing*, 163 U.S. at 235, 16 S.Ct. at 280, while he awaits deportation because there is nowhere for him to go but the United States. In fact, the Government has already surveyed him extensively during his eight years of incarceration. He has been evaluated by psychiatrists at Lompoc and at St. Elizabeth's Hospital.

These medical evaluations explain the difficulties Barrera encountered while in federal custody. He can be anxious, depressed, and even irritable. While his temperament may require some supervision, Barrera does not deserve to be imprisoned indefinitely.

Thus, the district court's order requiring Barrera's release to a halfway house offers the best solution. Judge Noonan aptly summarized the legal and moral basis for the original panel's decision: "In our society no person may be imprisoned for many years without prospect of termination. The rights of the human person must be vindicated as part of the common good of our society." I agree, and therefore dissent.