Oscar OLIVA, Petitioner,

v.

**UNITED STATES DEPARTMENT OF JUSTICE & Attorney General Gonzales,[1] Respondents.**

**Docket No. 03–40219.**

United States Court of Appeals, Second Circuit.

Argued: Aug. 1, 2005.

Decided: Dec. 30, 2005.

---

1.   Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Alberto R. Gonzales is automatically substituted for for-

**230**

Bruno Joseph Bembi, Hempstead, New York, for Petitioner.

Stephen J. Sorenson, First Assistant United States Attorney, District of Utah, Salt Lake City, Utah (Paul M. Warner, United States Attorney), for Respondent.

Before: CALABRESI and RAGGI, Circuit Judges, and COTE, District Judge.[2]

mer Attorney General John Ashcroft as a respondent in this case.

RAGGI, Circuit Judge.

Petitioner Oscar Oliva seeks review of a June 30, 2003 order of the Board of Immigration Appeals ("BIA"), upholding a September 7, 2001 oral ruling by an Immigration Judge ("IJ") ordering Oliva's removal from the United States. *See* 8 U.S.C. § 1252(a) (2000). Oliva submits that the BIA erred in failing to remand his case to the IJ for a further hearing pursuant to an international treaty, the United Nations Convention on the Rights of the Child ("CRC"), Nov. 20, 1989, 1577 U.N.T.S. 3, 28 I.L.M. 1448. Although the United States has not ratified the CRC, Oliva asserts that certain of its provisions, notably Articles 3(1) and 7(1), have attained the status of "customary international law," requiring immigration authorities to afford "the best interests" of his American-born child "primary consideration" in deciding whether to order Oliva's removal. We need not here decide whether CRC Articles 3(1) and 7(1) have attained the status of customary international law or whether their terms apply to Oliva's removal proceedings because, even if these two issues were to be resolved in Oliva's favor, he would not be entitled to a further hearing. This is because Section 304(a)(3) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009–546 (Sept. 30, 1996) (codified at 8 U.S.C. § 1229b(b)(1)), constitutes a "legislative enactment" that is a "controlling act[ ] which prevail[s] over international law," *Guzman v. Tippy*, 130 F.3d 64, 66 (2d Cir.1997) (*per curiam* ), and Oliva does not qualify for cancellation of removal under that statute. Accordingly, his petition for review is denied.

**2.** The Honorable Denise Cote, of the United States District Court for the Southern District of New York, sitting by designation.

## I. *Background*

Petitioner Oscar Oliva is a citizen of Guatemala who entered the United States without a visa on or about January 20, 1992. Oliva is the father of three children, two of whom live in Guatemala. The third child, a son, was born in the United States on May 21, 1997. Although Oliva is not married to this child's mother, he states that he lived with and provided support for her and their son.

On February 25, 1998, the Immigration and Naturalization Service ("INS")[3] issued Oliva a Notice to Appear to answer charges that he was present in the United States without having been lawfully admitted or paroled. At a hearing before an IJ, Oliva conceded his removability, but sought cancellation of removal under the Nicaraguan Adjustment and Central American Relief Act ("NACARA"), Pub.L. No. 105–100, 111 Stat. 2160, 2193 (Nov. 19, 1997), *amended by* Pub.L. No. 105–139, 111 Stat. 2644 (Dec. 2, 1997), *see* 8 U.S.C. § 1101 note. Concluding that Oliva was not eligible for NACARA relief, the IJ pretermitted his application and, in an oral decision rendered on September 7, 2001, ordered Oliva removed from the United States.[4]

Oliva appealed to the BIA. His principal argument was that the "technical requirements" for NACARA eligibility violated the Equal Protection Clause because they failed to establish a rational distinction between persons eligible and ineligible to apply for relief from removal. For the first time on appeal, Oliva also argued that he was entitled to seek relief from removal under the CRC and requested a remand to the IJ for a further hearing on this issue. In a decision dated June 30, 2003, the BIA dismissed Oliva's appeal without any mention of his CRC claim. It ruled that the IJ correctly pretermitted Oliva's NACARA application, and it noted its own lack of jurisdiction to hear Oliva's constitutional challenge to the statutory eligibility requirements for NACARA relief.

Oliva timely appeals the BIA's decision, raising a single argument: that the BIA erred as a matter of law in failing to

3. The Homeland Security Act of 2002 dissolved the INS and transferred its functions to newly created subdivisions in the Department of Homeland Security, effective March 1, 2003. *See* Pub.L. No. 107–296, 451, 471; 116 Stat. 2135, 2196, 2205 (codified as amended in scattered sections of the U.S.Code). The INS functions relevant to this case now reside in the Bureau of Citizenship and Immigration Services. *See* 6 U.S.C. § 271.

4. Congress enacted NACARA to allow certain aliens to apply for cancellation of removal under the more liberal criteria in effect prior to the enactment of IIRIRA. To qualify for this "special rule" cancellation, NACARA requires, *inter alia,* that a Guatamalan national must have (1) first entered the United States on or before October 1, 1990, and registered for benefits pursuant to the settlement agreement in *American Baptist Churches v. Thornburgh,* 760 F.Supp. 796 (N.D.Cal.1991), on or before December 31, 1991; or (2) filed an application for asylum with the INS on or before April 1, 1990. *See* IIRIRA §§ 309(c)(5)(C)(i)(I)(bb), 309(c)(5)(C)(i)(II), *as amended by* NACARA § 203(a); *see also* 8 U.S.C. § 1101 note. Because Oliva entered the United States in 1992, he is plainly ineligible to take advantage of the special rule under either of the qualifying provisions.

Current law permits an alien to seek relief from removal based on "exceptional and extremely unusual hardship" to a "spouse, parent, or child" who is a citizen or permanent resident of the United States. 8 U.S.C. § 1229b(b)(1)(D). The alien must, however, have "been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date" of his relief application. 8 U.S.C. § 1229b(b)(1)(A). Oliva had not satisfied this ten-year durational presence requirement at the time he applied to the IJ for relief from removal.

remand his case to the IJ to permit Oliva to apply for relief under the CRC.[5]

## II. Discussion

### A. Exhaustion of Administrative Remedies

This court "may review a final order of removal only if . . . the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). In this case, a question arises as to whether Oliva adequately exhausted his administrative remedies by asking the BIA to remand his case for a further hearing based on the CRC, given that Oliva had failed to invoke the CRC at his initial hearing before the IJ. The parties do not address this jurisdictional issue. *See Abimbola v. Ashcroft*, 378 F.3d 173, 180 (2d Cir.2004) (identifying same concern although finding it unnecessary to resolve).

■ We have not, however, requested further briefing from the parties to clarify the nature of Oliva's customary international law claim or his possible failure to exhaust his CRC claim before the IJ. Given our view of the merits of Oliva's claim, we do not need to do so. As in *Abimbola*, we conclude that the exhaustion question raises an issue of statutory, not constitutional, jurisdiction. In such circumstances, we may exercise hypothetical jurisdiction. *See Abimbola v. Ashcroft*, 378 F.3d at 180 (citing *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 816 n. 11 (2d Cir.2000)). We follow that procedure in this case to explain why we reject Oliva's customary international law claim as without merit and deny his petition for review of the BIA decision upholding his removal.

### B. Standard of Review

■ This court applies *de novo* review to Oliva's legal contention that he cannot be removed without affording him some opportunity to claim relief under the CRC. *See Arenas–Yepes v. Gonzales*, 421 F.3d 111, 114 (2d Cir.2005) (noting that we review the BIA's underlying conclusions of law *de novo*, except when it is interpreting ambiguous provisions of the Immigration and Nationality Act).

### C. Claims for Relief from Removal Based on Hardship to a Child Are Governed by Statute, not the CRC

#### 1. The Relevant CRC Provisions

Two provisions of the CRC are here at issue. Article 3(1) states that "[i]n all actions concerning children, whether undertaken by public or private social welfare institutions, courts of law, administrative authorities or legislative bodies, the best interests of the child shall be a primary consideration." Article 7(1) states that "as far as possible," a child shall have "the right to know and be cared for by his or her parents." Oliva submits that, consistent with these provisions, he cannot be ordered removed from the United States without some hearing affording "primary consideration" to whether his removal would be in "the best interests of" his American son with whom he has resided while in this country.

The applicability of the CRC to Oliva's removal proceeding is by no means clear. Although the United States signed the CRC on February 16, 1995, the treaty has never been presented to the Senate for its consent and, therefore, has never been

---

5. In light of Oliva's failure to advance his equal protection challenge to the agency conclusion that he was ineligible for NACARA relief, we deem that point waived and do not address it on this appeal. *See Pozdniakov v. INS*, 354 F.3d 176, 177–78 (2d Cir.2003) (*per curiam*).

ratified by the President.[6] Oliva appears to concede that, absent the consent of the Senate, the CRC does not constitute a treaty made "under the Authority of the United States." *See* U.S. Const. art. VI, cl. 2 (recognizing "all Treaties made ... under the Authority of the United States," as well as the Constitution and the laws made thereunder, as "the supreme Law of the Land"); *see also Avero Belg. Ins. v. Am. Airlines, Inc.*, 423 F.3d 73, 78 (2d Cir.2005) (explaining that a treaty has the force of domestic law only after receiving Senate consent and ratification by the President). Nevertheless, he argues that Articles 3(1) and 7(1) of the CRC have the force of United States law because they have attained the status of customary international law. He bases this claim on the fact that the CRC has been ratified by every nation in the world except for the United States and Somalia. *See* I United Nations, *Multilateral Treaties Deposited with the Secretary General* 282–83 (2003).

### 2. The Relationship Between Customary International Law and U.S. Domestic Law

"For two centuries," the Supreme Court has "affirmed that the domestic law of the United States recognizes the law of nations." *Sosa v. Alvarez–Machain*, 542 U.S. 692, 729–30, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (collecting cases). The concept of customary international law was famously discussed in *The Paquete Habana*, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900), a case involving the seizure of fishing vessels off the coast of Cuba during the Spanish–American War. In concluding that the vessels did not qualify as prizes of war, the Supreme Court looked to interna-

tional law, holding that "[i]nternational law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination." *Id.* at 700, 20 S.Ct. 290. The Court explained that such international law may originate "in custom or comity, courtesy or concession," which over the long passage of years grows "by the general assent of civilized nations, into a settled rule of international law." *Id.* at 694, 20 S.Ct. 290.

At the same time, however, the Court cautioned that resort to customary international law is appropriate only "where there is no treaty and no controlling executive or legislative act or judicial decision" that speaks to the issue in dispute. *Id.* at 700, 20 S.Ct. 290. In *United States v. Yousef*, 327 F.3d 56, 93 (2d Cir.2003), this court traced the long lineage of this limiting principle, beginning with *The Nereide*, in which Chief Justice Marshall wrote that while courts are "bound by the law of nations which is a part of the law of the land," Congress may apply a different rule "by passing an act for the purpose." 13 U.S. (9 Cranch) 388, 423, 3 L.Ed. 769 (1815). *Yousef* itself stated that, "[i]f a statute makes plain Congress's intent ..., then Article III courts ... must enforce the intent of Congress irrespective of whether the statute conforms to customary international law." 327 F.3d at 93 (internal citations omitted); *see also Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 939 (D.C.Cir.1988) (stating that "under domestic law, statutes supersede customary international law" and "no enactment of

---

**6.** Arguments for and against ratification of the CRC are discussed in various scholarly articles. *See, e.g.,* David P. Stewart, *Ratification of the Convention on the Rights of the Child,* 5 Geo. J. Fighting Poverty 161 (1998);

Bruce C. Hafen & Jonathan O. Hafen, *Abandoning Children to Their Autonomy: The United Nations Convention on the Rights of the Child,* 37 Harv. Int'l L.J. 449 (1996).

Congress can be challenged on the ground that it violates customary international law"). In *Sosa v. Alvarez–Machain,* the Supreme Court recently reiterated the point, observing that Congress may "at any time" preclude the application of customary international law to a particular situation "by treaties or statutes that occupy the field." 542 U.S. at 731, 124 S.Ct. 2739.

■ This principle controls our resolution of this appeal. Congress has enacted legislation defining the circumstances under which hardship to a child may appropriately be considered as a ground for granting relief from removal to a nonpermanent resident alien. *See* 8 U.S.C. § 1229b(b)(1). This statute, and not the CRC, necessarily determines the outcome of Oliva's request for a·hardship exception to removal.[7]

3. *The Controlling Effect of 8 U.S.C. § 1229b(b)(1)*

On September 30, 1996, Congress amended the Immigration and Nationality Act by adding Section 240A to address applications for cancellation of removal or adjustment of status. *See* IIRIRA § 304(a)(3) (codified in relevant part at 8 U.S.C. § 1229b). This amendment expressly authorizes the Attorney General (or his designated representative) to "cancel removal" if a nonpermanent resident alien establishes that his removal from this country "would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." 8

U.S.C. § 1229b(b)(1)(D). Congress, however, conditioned the availability of this relief upon the satisfaction of certain criteria. Specifically, an alien requesting relief from removal under § 1229b(b)(1) must show that he "(A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application; (B) has been a person of good moral character during such period; [and] (C) has not been convicted of [certain specified offenses]." 8 U.S.C. § 1229b(b)(1)(A-C). Oliva concedes that he fails to satisfy the first of these criteria. Nevertheless, he insists that he is entitled to relief under CRC Articles 3(1) and 7(1) because these provisions establish that the best interests of his U.S. citizen child, specifically his interest in knowing and being reared by his father, must be given primary consideration in any administrative proceeding, including removal hearings. We disagree.

To support his argument, Oliva essentially relies on Judge Weinstein's recognition of the CRC as customary international law in *Beharry v. Reno,* 183 F.Supp.2d 584 (E.D.N.Y.2002). In fact, Oliva's reliance is misplaced. The statute at issue in *Beharry* was 8 U.S.C. § 1182(h), which affords relief from removal to permanent residents who have resided in the United States for at least seven years and who have not been convicted of an aggravated felony. Because Beharry was convicted of a crime that was denominated an aggravated felony only after his commission of it, and because the district court concluded that Congress had not clearly expressed its in-

---

7. To the extent Oliva invokes *jus cogens* to claim that CRC Articles 3(1) and 7(1) supersede even statutes and treaties, his argument is without merit. *See United States v. Yousef,* 327 F.3d at 94–95 (observing that only a "few" norms of international law qualify as *jus cogens* and comparing a treaty to engage in the slave trade, which would be void under *jus cogens,* to a treaty to engage in the ivory trade, which would not); *Smith v. Socialist People's Libyan Arab Jamahiriya,* 101 F.3d 239, 242 (2d Cir.1996) (noting Libya's concession that the bombing of a passenger aircraft constituted a violation of *jus cogens* ).

tent with respect to the treatment of such prior conduct, the court concluded that it would violate customary international law, specifically CRC Article 3(1), to deny petitioner the ability to seek relief from removal based on family hardship. *See Beharry v. Reno*, 183 F.Supp.2d at 604–05.

Preliminarily, we observe that, in reversing the award of habeas corpus relief in *Beharry* on other grounds, this court specifically noted that "[n]othing in our decision ... should be seen as an endorsement of the district court's holding that interpretation of the [Immigration and Nationality Act] in this case is influenced or controlled by international law." *Beharry v. Ashcroft*, 329 F.3d at 63. Thereafter, in *Guaylupo–Moya v. Gonzales*, we observed that "it is not clear that the international law documents cited [by the district court] in *Beharry* rise to the level of customary international law." 423 F.3d 121, 135 (2d Cir.2005). We reiterate these observations here.[8]

More to the point, however, we note that the district court's reasoning in *Beharry* in fact offers no support for Oliva's claim that the CRC affords him relief from removal unavailable under § 1229b(b)(1). In *Beharry*, the court invoked and applied a principle of statutory interpretation first explicated in *The Charming Betsy*, 6 U.S. (2 Cranch) 64, 2 L.Ed. 208 (1804), to support its conclusion that the CRC relieved petitioner from the aggravated felony bar of 8 U.S.C. § 1182(h). In *The Charming Betsy*, the Supreme Court ruled that an ambiguous statute should be construed, whenever possible, not to conflict with international law. *See id.* at 118. This canon of statutory interpretation, however, does not apply where the statute at issue admits no relevant ambiguity. *See Guaylupo–Moya v. Gonzales*, 423 F.3d at 135; *United States v. Yousef*, 327 F.3d at 92; *see also Guaylupo–Moya v. Gonzales*, 423 F.3d at 131 (concluding that § 1182(h) is not ambiguous). In this case, we conclude that no ambiguity can be discerned in the timeliness requirement of § 1229b(b)(1). That statute clearly limits relief based on family hardship to aliens who have been continuously physically present in the United States for ten years. *See* 8 U.S.C. § 1229b(b)(1)(A).[9] It would make no sense to "interpret" this statute to afford Oliva a

---

8. Addressing the issue of customary international law in the context of the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, this court has stated that international declarations and covenants must offer " 'discernable standards and regulations' " in order to give effect to "virtuous goals" expressed in such documents. *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 254–55 (2d Cir.2003) (quoting *Beanal v. Freeport–McMoran, Inc.*, 197 F.3d 161, 167 (5th Cir.1999)); *see also Sosa v. Alvarez–Machain*, 542 U.S. at 725, 124 S.Ct. 2739 (requiring that a customary international law norm be defined with "a specificity comparable to the features of the 18th-century paradigms" recognized by the Court to constitute a viable basis for an ATCA claim). Oliva points us to nothing in the text, history, or implementation of the CRC to indicate what "standards and regulations" would determine the best interests of a child in the almost limitless variety of legislative, adminis-

trative, and judicial circumstances where that issue could arise.

9. In *Beharry*, the district court apparently recognized that the durational residency requirement of 8 U.S.C. § 1182(h) was an unambiguous expression of congressional intent that precluded relief under CRC Article 3(1), even accepting that provision as an expression of customary international law. In attempting to reconcile § 1182(h) and Article 3(1), the district court ruled that waivers of removal are available to aliens who meet the statute's "stringent requirements of seven years residence and 'extreme hardship' to family—if these aliens have been convicted of an 'aggravated felony' as defined after they committed their crime, but which was not so categorized when they committed the crime." *Beharry v. Reno*, 183 F.Supp.2d at 605.

CRC hearing, thereby effectively eliminating an unambiguous requirement specifically written into the statute by Congress.

 Indeed, we cannot do so. As this court recently observed, "clear congressional action trumps customary international law." *Guaylupo–Moya v. Gonzales*, 423 F.3d at 136; *see also TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 302 (D.C.Cir.2005) ("Never does customary international law prevail over a contrary federal statute."). This rule, of course, applies in immigration matters. *See, e.g., Wang v. Ashcroft*, 320 F.3d 130, 142 n. 18 (2d Cir.2003) ("We need not consider whether returning Wang to China impinges on any norms of customary international law because, in the instant case, the issue is governed by the treaties and legislative and regulatory enactments of the United States."); *Guzman v. Tippy*, 130 F.3d 64, 66 (2d Cir.1997) (*per curiam*) (noting that the indefinite detention of an excludable alien does not violate international law because international law was displaced by a legislative enactment, a decision of the Attorney General, and a ruling by the Supreme Court); *Barrera–Echavarria v. Rison*, 44 F.3d 1441, 1451 (9th Cir.1995) (*en banc*); *Gisbert v. United States Att'y Gen.*, 988 F.2d 1437, 1447–48 (5th Cir.1993); *Garcia–Mir v. Meese*, 788 F.2d 1446, 1453–55 (11th Cir.1986).

Accordingly, we hold that § 1229b(b)(1), and not any norm of customary international law that might be derived from the CRC, controls a nonpermanent resident alien's request for relief from removal based on family hardship.

## III. *Conclusion*

We need not decide whether Articles 3(1) and 7(1) of the Convention on the Rights of the Child could, in any circumstance, be deemed customary international law, nor need we decide whether those provisions would apply to a removal proceeding involving an adult nonpermanent resident alien. We conclude that, in any event, the CRC is irrelevant to petitioner's request for relief from removal based on hardship to his American-born child because such relief is clearly controlled by 8 U.S.C. § 1229b(b)(1). Because petitioner does not qualify for relief under the durational presence requirement imposed by that statute, the petition for review of the BIA decision upholding the IJ's order of removal is hereby DENIED.