**UNITED STATES of America,**
**Appellant**

v.

**Khalid Shaikh MOHAMMAD, Walid Muhammad Salih Mubarek bin 'Attash, Ramzi bin Al Shibh, Ali Abdul–Aziz Ali aka Ammar Al Baluchi, and Mustafa Ahmed Adam Al Hawsawi, Appellees**

**CMCR 17–002**

United States Court of Military Commission Review.

June 29, 2017

Brigadier General Mark S. Martins, U.S. Army, and Michael J. O'Sullivan on the briefs for Appellant.

James G. Connell, III, Alka Pradhan, Lieutenant Colonel Sterling R. Thomas, U.S. Air Force, Major Raashid S. Williams, JA, U.S. Army, and Major Jason Wareham, U.S. Marine Corps on the brief for Appellee Ali Abdul–Aziz Ali AKA Ammar al Baluchi.

David Z. Nevin, Gary D. Sowards, Major Derek A. Poteet, U.S. Marine Corps, and Rita Radostitz on the brief for Appellee Khalid Shaikh Mohammad.

Cheryl T. Bormann, Edwin A. Perry, Major Matthew H. Seeger, JA, U.S. Army, and Captain Brian D. Brady, U.S. Air Force, on the brief for Appellee Walid Muhammad Salih Mubarek bin 'Atash.

James P. Harrington, Alaina M. Wichner, and Major Christopher R. Lanks, U.S. Air Force, on the brief for Appellee Ramzi Bin al Shibh.

Watler B. Ruiz, Sean M. Gleason, Suzanne M. Lachelier, and Joseph D. Wilkinson II, for Appellee Mustafa Ahmed Adam al Hawsawi.

BEFORE THE COURT Burton, Chief Judge, Silliman, Deputy Chief Judge, and Herring, Appellate Judge

## PUBLISHED OPINION
## OF THE COURT

Opinion filed by Burton, Chief Judge.

This interlocutory appeal arises from the Military Commission Judge's decision to "terminate[ ] proceedings of the military commission with respect to a charge or specification" under 10 U.S.C. § 950d(a)(1). *See* Manual for Military Commissions (2012) (M.M.C), Rule for Military Commissions (R.M.C.) 908(a)(1). The Military Commission Judge dismissed Charges III and V because he ruled that the charges were barred by the statute of limitations in Article 43, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 943 and the Ex Post Facto Clause of the U.S. Constitution. We disagree and hold that Article 43 is not applicable to military commissions authorized by the Military Com-

missions Act (M.C.A.).[1] Title 10 U.S.C. 950t contains the unlimited statute of limitation that governs Appellees' military commission, and an unlimited statute of limitations has been in effect for U.S. military commissions for offenses occurring during hostilities since the war crimes trials of the late 1940s. Prosecution of Charges III and V does not violate the Ex Post Facto Clause.

### Statement of the Case

On May 31, 2011, Appellees were charged for their alleged involvement in the attacks on the World Trade Center and the Pentagon on September 11, 2001, resulting in the deaths of 2,976 people. Appellant App. 39–53. On April 4, 2012, the Convening Authority referred to trial by a "capital military commission" the following seven charges:

(I) conspiracy to commit offenses triable by a military commission, to wit, attacking civilians, attacking civilian objects, intentionally causing serious bodily injury, murder in violation of the law of war, destruction of property in violation of the law of war, hijacking or hazarding a vessel or aircraft, and terrorism, *id.* § 950t(29); (II) attacking civilians, *id.* § 950t(2); (III) attacking civilian objects,

*id.* § 950t(3); (IV) murder in violation of the law of war, *id.* § 950t(15); (V) destruction of property in violation of the law of war, *id.* § 950t(16); (VI) hijacking or hazarding a vessel or aircraft, *id.* § 950t(23); and (VII) terrorism, *id.* § 950t(24).

Appellant Br. 2–3 (citing Appellant App. 408–29).

On January 25, 2012, Appellees were charged with the Additional Charge "of intentionally causing serious bodily injury, 10 U.S.C. § 950t(13)," and on April 4, 2012, the Convening Authority referred the Additional Charge to trial by military commission. Appellant Br. 3 (citing Appellant App. 142–61).

On May 5, 2012, Appellees were arraigned. *Id.* They have not entered a plea to any of the charges. *Id.* On April 7, 2017, the Military Commission Judge dismissed with prejudice Charges III and V. Appellant App. 408–29.[2] Appellant timely filed an appeal from this decision.

### Statement of Facts

The Military Commission Judge concluded that the five-year statute of limitations made applicable to courts-martial under Article 43, UCMJ must be applied to

---

**1.** The Military Commissions Act of 2006 (2006 M.C.A.), Pub. L. No. 109–366, 120 Stat. 2600, 10 U.S.C. § 948a, *et. seq.*, became law on October 17, 2006. The Military Commissions Act of 2009 (2009 M.C.A.), Pub. L. No. 111–84, 123 Stat. 2574, 10 U.S.C. §§ 948a–950t, became law on October 28, 2009.

**2.** The 2009 M.C.A. § 950t(3) and (16) state:

§ 950(t) *Crimes triable by military commission*

The following offenses shall be triable by military commission under this chapter [10 USCS §§ 948a et seq.] at any time without limitation:

\* \* \*

(3) *Attacking civilian objects.* Any person subject to this chapter [10 USCS §§ 948a et

seq.] who intentionally engages in an attack upon a civilian object that is not a military objective shall be punished as a military commission under this chapter [10 USCS §§ 948a et seq.] may direct.

\* \* \*

(16) *Destruction of property in violation of the law of war.* Any person subject to this chapter [10 USCS §§ 948a et seq.] who intentionally destroys property belonging to another person in violation of the law of war shall punished as a military commission under this chapter [10 USCS §§ 948a et seq.] may direct.

Charges III and V in Appellees' military commission. The Military Commission Judge observed:

> [T]his matter turns on the question of what statute of limitations—if any—applied from the time the offenses alleged in Charges III and V were committed through the passage of the M.C.A. 2006. If the offenses thereby became time-barred prior to the M.C.A. 2006's passage,[3] then, under *Stogner [v. California*, 539 U.S. 607, 611, 123 S.Ct. 2446, 156 L.Ed.2d 544 (2003) ], they must be dismissed.

Appellant App. 422–23.[4]

Distinguishing *In re Yamashita*, 327 U.S. 1, 11–12, 66 S.Ct. 340, 90 L.Ed. 499 (1946), the Military Commission Judge decided the "jurisdictional authority to convene a military commission at any time during the existence of a conflict does not necessarily foreclose the ability to establish procedural controls limiting the exercise [of] that authority" such as by imposition of statutes of limitation. Appellant App. 426.

The Military Commission Judge considered the version of Article 36, UCMJ, 10 U.S.C. § 836 (2000) in effect on September 11, 2001, to be of critical importance to his analysis. Article 36, UCMJ (2000) stated:

**President may prescribe rules.**

(a) Pretrial, trial, and post-trial procedures, including modes of proof, for cases arising under this chapter [10 USCS §§ 801 et seq.] triable in courts-martial, military commissions and other military tribunals, and procedures, for courts of inquiry, may be prescribed by the President by regulations which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with this chapter [10 USCS §§ 801 et seq.].

(b) All rules and regulations made under this article shall be uniform insofar as practicable.

Quoting from *Hamdan v. Rumsfeld*, 548 U.S. 557, 620, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006), the Military Commission Judge stated:

> Article 36 places two restrictions on the President's power to promulgate rules of procedure for courts-martial and military commissions alike. First, no procedural rule he adopts may be "contrary to or inconsistent with" the UCMJ—however practical it may seem. Second, the rules adopted must be "uniform insofar as practicable." That is, *the rules applied to military commissions must be the same as those applied to courts-martial unless such uniformity proves impracticable.*

Appellant App. 418 (emphasis added by Military Commission Judge).

---

**3.** The 2006 M.C.A. § 950v(b) indefinitely extended the statute of limitations for Charges III and V, and it became law on October 17, 2006. (10 U.S.C. § 950v(b) states, "The ... offenses shall be triable by military commission under this chapter at any time without limitation[.]"). *See Stogner v. California*, 539 U.S. 607, 618, 123 S.Ct. 2446, 156 L.Ed.2d 544 (2003) (citations omitted) ("[E]xtension of existing limitations periods is not ex post fac-

to 'provided,' ... the prior limitations periods have not expired.").

**4.** Appellant App. 408–429 is the Military Commission Judge's April 7, 2017 ruling dismissing Charges III and V as barred by the statute of limitations in Article 43, Uniform Code of Military Justice (UCMJ). AE 251J.

The 2006 M.C.A. §§ 4(a)(2) and (3) amended the UCMJ as follows:

(2) *Exclusion of Applicability to Chapter 47A Commissions.*—Sections 821, 828, 848, 850(a), 904, and 906 (articles 21, 28, 48, 50(a), 104, and 106) are amended by adding at the end the following new sentence: "This section does not apply to a military commission established under chapter 47A of this title."

(3) *Inapplicability of Requirements Relating to Regulations.*—Section 836 (article 36) is amended—(A) in subsection (a), by inserting ", except as provided in chapter 47A of this title," after "but which may not"; and (B) in subsection (b), by inserting before the period at the end ", except insofar as applicable to military commissions established under chapter 47A of this title".

The version of Article 43 in effect on September 11, 2001, provided as follows:

(a) A person charged with absence without leave or missing movement in time of war, or with any offense punishable by death, may be tried and punished at any time without limitation.

(b)(1) Except as otherwise provided in this section (article), a person charged with an offense is not liable to be tried by court-martial if the offense was committed more than five years before the receipt of sworn charges and specifications by an officer exercising summary court-martial jurisdiction over the command.

\* \* \*

(c) Periods in which the accused is absent without authority or fleeing from justice shall be excluded in computing the period of limitation prescribed in this section (article).

(d) Periods in which the accused was absent from territory in which the United States has the authority to apprehend him, or in the custody of civil authorities,[5] or in the hands of the enemy, shall be excluded in computing the period of limitation prescribed in this article.

(e) For an offense the trial of which in time of war is certified to the President by the Secretary concerned to be detrimental to the prosecution of the war or inimical to the national security, the period of limitation prescribed in this article is extended to six months after the termination of hostilities as proclaimed by the President or by a joint resolution of Congress.[6]

Because the 2006 M.C.A. § 950v(b) and 2009 M.C.A. § 950t indicate crimes triable by military commission "shall be triable by

---

**5.** There was no evidence presented on the statute of limitations motion about Appellees being "in the custody of civil authorities" at the military commission. The parties provided information about Appellees' capture by U.S. forces in their briefs. *See, e.g.,* Appellee Bin al Shibh Br. 2 ("Mr. Bin al Shibh was captured and detained in September 2002 by the hands of the United States Government in the Central Intelligence Agency's Rendition, Detention, and Interrogation Program. He was held incommunicado at undisclosed locations around the world until 2006, when he was transferred to his current location at Guantanamo Bay, Cuba."). In March 2003, Appellees Mohammad and Hawsawi were captured. Appellant Br. 6, 14. In April 2003, Appellees Bin 'Attash and Ali were captured. *Id.* (citing AE 31 at 4–5, Appellant App. 165–66). All appellees were captured outside of the United States. *Id.*

**6.** Article 43(e), UCMJ, does not apply. The President or a joint resolution of Congress have not proclaimed termination of hostilities.

military commission under this chapter at any time without limitation," the M.M.C. does not describe how the pertinent time periods to assess the statute of limitations would be calculated. The Military Commission Judge explained that the statute of limitations for military commissions is tolled as follows:

> At court-martial, the statute of limitations tolls when preferred charges are received by the officer exercising summary-court martial convening authority over the accused. 10 U.S.C. § 843(b)(1). The most analogous act under the R.M.C. is receipt of charges by the Convening Authority for disposition. *See* Regulation for Trial by Military Commission, paras. 2–3.a; 3–3; 4–3 (2011); R.M.C., Ch. IV. Accordingly, for purposes of the present matter, the Commission determines this to be the relevant date.

Appellant App. 422 at n. 74. The Military Commission Judge calculated that from September 11, 2001, the date of the alleged offenses in Charges III and V, to April 15, 2008, the date the Convening Authority received the charges totaled six years, seven months, and four days. Appellant App. 422 and n. 75.

During the litigation on the motion, the parties indicated Appellees had the burden of proof on the motion. Appellant Br. 15 n. 10 (citations omitted). After the parties presented their facts and arguments, the Military Commission Judge commented that Appellee would normally have the burden of persuasion under R.M.C.

§ 905(c)(1)–(2) [7] "regarding any factual issues predicate to the relief he seeks." He concluded Appellee had raised the statute of limitations; and "the burden then shift[ed] to the Government to establish that the offenses are not, in fact, time-barred." Appellant App. 411–12.

The Military Commission Judge did not inform the parties that Appellant had the burden of establishing tolling periods under Article 43(c) and 43(d), UCMJ. *See* Military Commissions Trial Judiciary Rule of Court (RC) 3.8 (2014 ed. and 2016 ed.) (requiring a party to provide notice when claiming a shift in the burden of persuasion). Appellant Br. 15 n. 10 (citing Appellant App. 1305, 1310–11) ).

The Military Commission Judge relied on *Musacchio v United States*, —— U.S. ——, 136 S.Ct. 709, 193 L.Ed.2d 639 (2016), which states, "When a defendant presses a limitations defense, the Government then bears the burden of establishing compliance with the statute of limitations by presenting evidence that the crime was committed within the limitations period or by establishing an exception to the limitations period." *Id.* at 718 (citing *United States v. Cook*, 84 U.S. 168, 179, 17 Wall. 168, 21 L.Ed. 538 (1872) ).

The Military Commission Judge concluded:

> [T]he Commission is persuaded that, prior to passage of the M.C.A. 2006, absent effective action by the Government establishing [a] differing procedure in accordance with Article 36 of the U.C.M.J. (as construed by the *Hamdan* Court),

---

**7.** Rule for Military Commission 905(c) ("(c) *Burden of proof.* (1) *Standard.* Unless otherwise provided in this Manual, the burden of proof on any factual issue the resolution of which is necessary to decide a motion shall be by a preponderance of the evidence. (2) *As-*

*signment.* (A) Except as otherwise provided in this Manual the burden of persuasion on any factual issue the resolution of which is necessary to decide a motion shall be on the moving party ...").

court-martial procedure was applicable to military commissions—to include Article 43, U.C.M.J. The [customary international law (CIL)] principle cited by the Government, however well-established, cannot override the U.C.M.J.—a domestic statute. The Government has cited no authority sufficient to contravene Articles 36 and 43 of the U.C.M.J. in this regard.

Appellant App. 427.

### Standard of Review

■■■ Our review of Government appeals under 10 U.S.C. § 950d(a)(1)–(3) is limited to matters of law. The application of Article 43 is a question of law and is subject to *de novo* review. *See United States v. Villanueva–Sotelo*, 515 F.3d 1234, 1237 (D.C. Cir. 2008) ("The government now appeals. Because this case presents a pure question of statutory interpretation, we review the district court's decision *de novo*.") (citation omitted); *United States v. Lopez de Victoria*, 66 M.J. 67, 73 n. 11 (C.A.A.F. 2008) (citation omitted); *United States v. Khadr*, 717 F.Supp.2d 1215, 1220 (C.M.C.R. 2007) (citations omitted).

### Ex Post Facto Clause

■■ We agree with the parties that the Ex Post Facto Clause is applicable to analysis of the application of statute of limitations to Charges III and V.[8] Appellant Br. 23; Appellee Br. 10, 13. 55–56. In 1798, Justice Chase listed the four kinds of laws that violate the prohibition against ex post facto laws in Article 1, Section 9, Clause 3 of the U.S. Constitution.

1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender. All these, and similar laws, are manifestly unjust and oppressive.

*Calder v. Bull*, 3 U.S. 386, 390–91, 3 Dall. 386, 1 L.Ed. 648 (1798) (opinion of Chase, J.) (1798). "[E]xtending a limitations period after the State has assured 'a man that he has become safe from its pursuit … seems to most of us unfair and dishonest.'" *Stogner*, 539 U.S. at 611, 123 S.Ct. 2446 (citing *Falter v. United States*, 23 F.2d 420, 426 (2d Cir. 1928)). "'The statute [of limitations] is … an amnesty, declaring that after a certain time … the offender shall be at liberty to return to his country … and … may cease to preserve the proofs of his innocence.'" *Id.* at 611, 123 S.Ct. 2446 (quoting F. Wharton, *Criminal Pleading and Practice* § 316, p. 210 (8th ed. 1880)). Permitting extension of the statute of limitations "risks both 'arbitrary and potentially vindictive legislation,' and erosion of the separation of powers." *Id.* (citations omitted).

In *Stogner*, the Supreme Court found that "California's law falls within the literal

---

**8.** *See Al Bahlul v. United States*, 767 F.3d 1, 18 (D.C. Cir. 2014) (en banc), *reconsidered*, 840 F.3d 757 (D.C. Cir. 2016) (en banc), *remanded for sentence reassessment*, 2015 U.S. App. LEXIS 16967 (D.C. Cir. 2016) (noting the Government's concession that the Ex Post Facto Clause applies, and stating "we will assume without deciding that the Ex Post Facto Clause applies at Guantanamo. In so doing, we are 'not to be understood as remotely intimating in any degree an opinion on the question.'").

terms of Justice Chase's second category," and "it may fall within [the fourth] category as well." *Id.* at 615, 123 S.Ct. 2446. The Court held that a state statute extending a criminal limitations period for child sex abuse violated the Ex Post Facto Clause, when applied to revive offenses that were time-barred when the statute was enacted. *Stogner*, 539 U.S. at 609–10, 123 S.Ct. 2446.

Section 950v(b) of the 2006 M.C.A, and section 950t of the 2009 M.C.A. indicate crimes triable by military commission "shall be triable by military commission under this chapter at any time without limitation." President Bush and President Obama and two Congresses determined that no statute of limitations should apply to the offenses committed on September 11, 2001. *See* 10 U.S.C. § 948d (granting jurisdiction "before, on, or after" 9/11). In order to avoid an obvious ex post facto problem, two Presidents and Congress had to conclude that the M.C.A. is a codification of common law of war principles that existed on September 11, 2001. *See* President Bush's Remarks on Signing the Military Commissions Act of 2006 (Oct. 17, 2006) in Administration of George W. Bush 1833 (2006) ("When I sign this bill into law, we will use these commissions to bring justice to the men believed to have planned the attacks of September the 11th, 2001," as well as others who are alleged to have committed law of war offenses before September 11, 2001.), https://www.gpo.gov/fdsys/pkg/WCPD-2006-10-23/pdf/WCPD-2006-10-23-Pg1831.pdf.

■ We look to historical practice of U.S. military commissions before enact-

ment of the M.C.A. for precedent relating to whether military commissions were limited to the statute of limitations used by courts-martial. *See Al Bahlul v. United States*, 840 F.3d 757, 764 (D.C. Cir. 2016) (en banc) (citing *Zivotofsky v. Kerry*, —— U.S. ——, 135 S.Ct. 2076, 2091, 192 L.Ed.2d 83 (2015) ("In separation-of-powers cases this Court has often put significant weight upon historical practice.") (internal quotation marks omitted); *NLRB v. Canning*, —— U.S. ——, 134 S.Ct. 2550, 2560, 189 L.Ed.2d 538 (2014) ("[L]ongstanding practice of the government can inform our determination of what the law is") (internal quotation marks and citations omitted). We will also consider, in turn, whether customary international law established an unlimited statute of limitations.[9]

## Civil War Era

The Supreme Court addressed war-time extension of statutes of limitations in two post–Civil War decisions. The Court held that commercial "statutes of limitations were tolled for 'the time during which the courts in the States lately in rebellion were closed to the citizens of the loyal States.'" *Stogner*, 539 U.S. at 620, 123 S.Ct. 2446 (quoting *Stewart v. Kahn*, 78 U.S. 493, 503, 11 Wall. 493, 20 L.Ed. 176 (1871); citing *Hanger v. Abbott*, 73 U.S. 532, 539–42, 6 Wall. 532, 18 L.Ed. 939 (1868) ). The Supreme Court in *Hanger* upheld an 1864 statute extending the statute of limitations for criminal and civil cases "for periods during which the war had made service of process impossible or courts inaccessible."

9. We agree with the parties that "no enactment of Congress can be challenged on the ground that it violates customary international law." Appellee Br. 49 (quoting *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 939 (D.C. Cir. 1988)

and citing *Oliva v. United States*, 433 F.3d 229, 233–34 (2d Cir. 2005); *Tag v. Rogers*, 267 F.2d 664, 666 (D.C. Cir. 1959) ); Appellant Br. 39 ("clear and controlling domestic law takes precedence over international law").

*Id.* (citing *Hanger*, 73 U.S. at 541). The Court in *Stogner* suggested that the Court in *Stewart* "could have seen the [1864] statute as ratifying a pre-existing expectation of tolling due to wartime exigencies, rather than as extending limitations periods that had truly expired." *Id.* (citing *Hanger*, 73 U.S. at 541; *Stewart*, 78 U.S. at 507). "Significantly, in reviewing this civil case, the Court upheld the statute as an exercise of Congress' war powers without explicit consideration of any potential collision with the Ex Post Facto Clause." *Id.* (internal citation omitted).

In 1806, Article of War 88 included a two-year statute of limitations for criminal offenses at court-martial that would run from the date of the offense unless the accused "by reason of having absented himself, or some other manifest impediment, shall not have been amenable to justice within that period." [10] In 1874, Article of War 103 was enacted, and it included the "manifest impediment" exception to the two-year statute of limitations. [11] Article of War 39 in enactments of 1916 and 1920 contained the same manifest impediment exception. [12]

On September 28, 1864, Brigadier General (BG) Joseph Holt wrote Major H. L. Burnett about whether certain offenses should be tried by military commission or courts-martial and which procedures from courts-martial should be used for military commissions. Appellant App. 953–57. BG Holt said that the 88th Article of War, *see supra* note 10, was applicable to military commissions, stating:

> Your view, that proceedings before Military Commissions should not be subject to the limitation prescribed by the 88th Article of War, in the case of a prosecution before a Court Martial, is not concurred in. It has been the uniform ruling of this Bureau that the military commission should be assimilated to the Court Martial in the rules which govern its constitution and in its forms of proceeding generally; and it is deemed most important that this correspondence should be maintained as far as possible .... Moreover [the inclusion of the "practice[s] of ordinary criminal courts" in military commissions] would tend to defeat the ends of the legislation of Congress, which in placing the military commission in many respects upon the same footing with the Court Martial has evidently contemplated the application to

---

10. William Winthrop, *Military Law and Precedents* at 984 (2d ed. 1920) (1920 Winthrop) (quoting Article of War 88 (1806), Act of Apr. 10, 1806, ch. 20, 2 Stat. 359). Article of War 88 reads:

 No person shall be liable to be tried and punished by a general court-martial for any offense which shall appear to have been committed more than two years before the issuing of the order for such trial, unless the person, by reason of having absented himself, or such other manifest impediment, shall not have been amenable to justice within that period.

 *Id.* at 984.

11. *Id.* at 994 (quoting Article of War 103 (1874) in Rev. Stat. § 1342 (The American Articles of War of 1874 (2d ed. June 22, 1874). Appellant App. 17, 478. Congress amended Article of War 103 on April 11, 1890, in 26 Stat. 54 to exclude time outside the United States in cases of desertion. *See* 1920 Winthrop at 998. *See also United States v. Troxell*, 30 C.M.R. 586 (NBR 1960), *rev'd*, 12 USCMA 6, 30 CMR 6 (1960) (discussing statutes of limitations).

12. Act of Aug. 29, 1916, ch. 418, § 3, 39 Stat. 619, 656 (1916 Articles of War). Appellant App. 479–484; Act of June 4, 1920, ch. 227, 41 Stat. 759, 794 (1920 Articles of War). Appellant App. 485–490.

the former, *as far as practicable*,[13] of the statutory rules of procedures which prevail in the case of the latter.

Appellant App. 958–60 (emphasis added). BG Holt did not indicate the criteria for determining when the two-year statute of limitations in the 88th Article of War was not "practical." The letter from BG Holt of September 1864 is the reference cited in the JAG Digests of 1880, 1895, 1901, 1912, and 1917 concerning the statute of limitations applicable to military commissions during the Civil War. Appellant App. 958–60. *See also infra* note 14.

Colonel William Winthrop, the "Blackstone of military law," *see Hamdan*, 548 U.S. at 597, 126 S.Ct. 2749 (plurality opinion) (citing *Reid v. Covert*, 354 U.S. 1, 19 n. 38, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (plurality opinion) ), authored the 1880 and 1895 Digests of the Judge Advocate General (JAG Digests), where he indicated the court-martial "two-years limitation would properly be applied to prosecutions before" military commissions; however, this feature is not "made *essential* by statute." [14]

With regard to general courts-martial, Winthrop explains that the term, "manifest impediment,"

> refers to such conditions as the being held as a prisoner of war in the hands of the enemy, or the being imprisoned under the sentence of a civil court upon conviction of crime—during the whole or a portion of the period of limitation. More generally, the Attorney General defines this term as meaning "something akin to absence," i. e. "want of power or physical inability to bring the party charged to trial."

1920 Winthrop at 257 (internal footnotes omitted). Some contemporaries of Colonel Winthrop indicated the two-year statute of limitations for courts-martial applied to military commissions.[15] Major General Davis stated:

> The period of time within which prosecutions must be instituted at military law is fixed by the 103d Article of War, as to all military offenses except desertion in time of peace, at two years prior to issue of the order for such trial, unless the offender "by reason of having absented himself, or *of some other manifest im-*

13. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 622, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) ("Without reaching the question whether any provision of Commission Order No. 1 is strictly 'contrary to or inconsistent with' other provisions of the U.C.M.J., we conclude that the 'practicability' determination the President has made is insufficient to justify variances from the procedures governing courts-martial.") (citations omitted).

14. 1895 JAG Digest 501 (emphasis in original). Appellant App. 964–65; 1880 JAG Digest 327, Appellant App. 962–63. *See also* Captain Charles Howland, 1912 JAG Digest 1070, *reprinted in* Govt. Printing Office (1917) ("In view of the analogy prevailing ... between these bodies and courts-martial, [it has been] held ... that the two years' limitation would

properly be applied to prosecutions before [military commissions].''). Appellant App. 968–73; Major Charles McClure, 1901 JAG Digest 463 (stating same). Appellant App. 966–67. All cited JAG Digests refer to Record Books of the Bureau, vol. IX, pg. 657 (Sept. 1864). *See, e.g.*, 1912 JAG Digest 1070. Appellant App. 970. *See also, e.g.*, Military Commission Judge Decision, at 20 & n. 97, Appellant App. 427 & n. 97.

15. *See, e.g.*, Major General George B. Davis, *A Treatise on the Military Law of the United States Together With the Practice and Procedure of Courts–Martial and Other Military Tribunals* 313 (3d ed., rev. 1915) (stating same). Appellant App. 1327–28.

*pediment*, he shall not have been amenable to justice within that period." [16]

Winthrop's 1895 JAG Digest listed the following established "manifest impediments" to applying the statute of limitations under Article of War 103:

> Absence from the United States as a fugitive from civil justice. Absence from the United States originally by authority but protracted by reason of detention by the authorities of the country of which the soldier was a native. Any absence from the United States during such a proportion of the interval since the commission of the offence as to leave less than two years during which the party was in this country and amenable to justice. Arrest and confinement by the civil authorities of the United States, or of a State, & c., under a charge or upon a conviction of a civil offence, where the party has not been discharged from such confinement within two years prior to the order convening the court-martial. Detention as a prisoner of war or in the compulsory service of the enemy during the interval, (a brief period only excepted,) of the absence.

*Id.* at 122 (internal citations omitted).

The Attorney General indicated, " 'Manifest impediment,' as used in [the 88th] article, does not mean merely a want of evidence, or ignorance as to the offender or offense by the military authorities, but it means something akin to absence—*want of power, or a physical inability to bring the party charged to trial.*" 14 Op. Att'y Gen. 263 at *1 (June 30, 1873) (emphasis added).

In the 1920 version of *Military Law and Precedents*, Colonel Winthrop stated:

> In the absence of any statute or regulation governing the proceedings of military commissions, the same are commonly conducted according to the rules and forms governing courts-martial. These war-courts are indeed more summary in their action than are the courts held under the Articles of war, and, as their powers are not defined by law, their proceedings—as heretofore indicated—will not be rendered illegal by the omission of details required upon trials by courts-martial ... But, as a general rule, and as the only quite safe and satisfactory course for the rendering of justice to both parties, a military commission will—like a court martial—permit and pass upon objections interposed to members, as indicated in the 88th Article of war, will formally arraign the prisoner, allow the attendance of counsel, entertain special pleas if any are offered, [fn 27—Provided they are legally apposite. *Thus a plea of the statute of limitations would not be, under the terms of Art. 103.*][17] receive all the

---

**16.** Major General George B. Davis, *A Treatise on the Military Law of the United States Together With the Practice and Procedure of Courts–Martial and Other Military Tribunals* 111 (2d ed., rev. 1909) (emphasis added).

**17.** The Military Commission Judge acknowledged that Winthrop's footnote 17 "strongly impl[ied] that statutes of limitation were ordinarily considered inapplicable to military commissions at the time of that writing." Appellant App. 426. The Military Commission Judge noted:

[A] a single footnote, even from his well-regarded treatise, is a slender reed. Other contemporaneous sources indicate statutes of limitation were, at times, historically applied in U.S. military commissions. Furthermore, Col. Winthrop wrote his treatise antecedent to the passage of Article of War 38—which would become U.C.M.J. Article 36. Therefore, whatever Col. Winthrop's position on this question, it cannot have taken Article 36 and its pronouncement of proce-

material evidence desired to be introduced, hear argument, find and sentence after adequate deliberation, ..., and, while in general even less technical than a court-martial, will ordinarily and properly be governed, upon all important questions, by the established rules and principles of law and evidence.

1920 Winthrop at 841–42 (additional emphasis added, internal footnotes omitted except for footnote 27). Appellant App. 1325–26. *See also* Winthrop, Military Law, vol. II, 74–75 (1886) (stating same).

In sum, Colonel Winthrop believed that the two-year statute of limitations in Article of War 88 and subsequently in Article of War 103 did not apply to military commissions. Other prominent experts of military law believed the two-year statute of limitations in courts-martial applied "as far as practicable;" [18] however, under many scenarios in a conflict it would be impractical to apply the two-year statute of limitations. Even when the two-year statute of limitations was applied, it was not applied where there was a "manifest impediment." The existence of a "manifest impediment"

was decided on a case-by-case basis, and we have not discovered any Civil War military commissions where the charges were dismissed because of a violation of the statute of limitations.

## Post–World War II War Crimes Trials

Article of War 39 replaced Article of War 103, and Article of War 39, governed the statute of limitations for Army courts-martial from 1921 to 1950.[19] Article of War 39 provides:

> Art. 39. *As to Time.*—Except for desertion committed in time of war, or for mutiny or murder, no person subject to military law shall be liable to be tried or punished by a court-martial for any crime or offense committed more than two years before the arraignment of such person: *Provided,* That for desertion in time of peace or for any crime or offense punishable under articles ninety-three[20] and ninety-four[21] of this code the period of limitations upon trial and punishment by court-martial shall be three years: *Provided further,* That the period of any absence of the accused

dural parity—which was central to Hamdan—into account.
Appellant App. 427 (internal footnotes omitted).

18. *See* War Dept. Gen. Or. No. 69 (Oct. 15, 1846), *reprinted in Messages of the President of the United States with the Correspondence, Therewith, Communicated, - Between the Secretary of War and Officers of the Government on the Subject of the Mexican War,* H.R. Exec. Doc. 60 at 1266 (1848) (explaining that every council of war, the predecessor to military commissions "will, *as far as practicable,* be governed by the same limitations, rules, principles, and procedure, including reviews, modifications, meliorations, and approval of sentence") (emphasis added). *See also* 1920 Winthrop at 835 n. 81.

19. *See* Manual for Courts–Martial (1921 ed.) (1921 MCM), Introduction XIII–XX; App. 1,

487–92 (describing changes from the Code of 1874 to the Code of 1920, 41 Stat. 787).

20. Article of War 93 states:

> *Various crimes.*—Any person subject to military law who commits manslaughter, mayhem, arson, burglary, housebreaking, robbery, larceny, embezzlement, perjury, forgery, sodomy assault with intent to commit any felony, assault with intent to do bodily harm with a dangerous weapon, instrument, or other object, or assault with intent to do bodily harm, shall be punished as a court-martial may direct.

Article of War 93 (quoted in 1921 MCM, App. 1, 527).

21. Article of War 94 prohibits frauds against the United States. Article of War 94 (quoted in 1921 MCM, App. 1, 527).

from the jurisdiction of the United States, and also any period during which by reason of *some manifest impediment* the accused shall not have been amenable to military justice, shall be excluded in computing the aforesaid periods of limitation: *And provided further*, That this article shall not have the effect to authorize the trial or punishment for any crime or offense barred by the provisions of existing law.[22]

The Manual for Courts–Martial (1921 ed.) (1921 MCM), ¶ 149(2) provides:

(2) *Limitations as to Time.*—(a) In the following cases there is no limitation as to time upon trial by court-martial (A. W. 39), viz: (1) Desertion committed in time of war; (2) Mutiny; or (3) Murder.

(b) The period of limitation upon trial and punishment by court-martial shall be three (3) years in the following cases (A. W. 39), viz: (1) Desertion in time of peace; (2) Any crime or offense punishable under A. W. 93; or (3) Any crime or offense punishable under A. W. 94.

(c) No person subject to military law shall be liable to be tried or punished by a court-martial for any crime or offense not enumerated in subparagraph (a) or subparagraph (b), supra, committed more than two (2) years before the arraignment of such person (A. W. 39).

(d) *Computation of the period of limitation.*—The point at and from which the period of limitation is to begin to run is the date of the commission of the offense. The point at which the period of limitation is to terminate and from which said period is to be reckoned back is the date of arraignment of the accused. There must be excluded in computing this period—(1) The period of any absence of the accused from the jurisdiction of the United States; and (2) Any period during which by reason of some manifest impediment the accused shall not have been amenable to military justice.

NOTES.—"Manifest impediment" means only such impediments as operate to prevent the court-martial from exercising its jurisdiction, and includes such conditions as being held as a prisoner of war in the hands of the enemy, or being imprisoned under the sentence of a civil court upon conviction of crime (*In re Davison*, 4 Fed. Rep., 510); but any concealment of the evidence of their guilt or other like fraud on their part while they remain within the jurisdiction of the United States by which the prosecution is delayed until the time the bar has run does not deprive them of the benefit of the statute. (14 Op. Atty. Gen., 268.)

1921 MCM at 118 (emphasis in original). "Manifest impediment" refers to "an impediment to the bringing of the offender to trial and punishment," such as "absence from the United States" or other circumstances "prevent[ing] the offender from being amenable to justice … [or] prevent[ing] the military court from exercising its jurisdiction over him; as, for instance, his being continuously a prisoner in the hands of the enemy, or of his being imprisoned under sentence of a civil court for crime, and the like.[23]

---

**22.** Article of War 39 (first, second, and fourth emphasis in original; third emphasis added) (quoted from Manual for Courts–Martial (1921 ed.) (1921 MCM), App. 1, 507).

**23.** *In re Davison*, 4 F. 507, 510 (S.D. N.Y. 1880) (citing 1 Op. Att'y Gen. 383 (Jul. 25, 1820); 13 Op. Att'y Gen. 462 (June 23, 1871); 14 Op. Att'y Gen. 52 (June 12, 1872) (other citation omitted) ).

The Allies decided during World War II that war criminals would face justice for violations of the law of war.[24] The United States and Great Britain issued regulations governing the procedures for law of war trials conducted by each nation.[25] Eight countries, Australia, China, France, Netherlands, Philippines, Soviet Union, United Kingdom, and the United States conducted war crimes trials in the Far East after World War II. International Criminal Court website, https://www.legal-tools.org/en/browse/ltfolder/.

At Nuremberg, the allies decided "to establish a uniform legal basis in Germany for the prosecution of war criminals and other similar offenders, other than those dealt with by the International Military Tribunal" also known as the "IMT." [26]

Control Council Law No. 10 states "In any trial or prosecution for a crime herein referred to, the accused shall not be entitled to the benefits of any statute of limitation in respect of the period from 30 January 1933 to 1 July 1945 ...." [27] The temporal jurisdiction of the military tribunal in Europe began with the start of the war.[28] The United States prosecuted German war criminals by Intermediate and General Military Government Courts for violations of the laws of war under Control Council No. 10 after the two-year period then specified in the statute of limitations provision applicable to courts-martial in Article 39 of the 1920 Articles of War.[29]

**24.** Charter of the International Military Tribunal, in Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, London Agreement of Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279.

**25.** United Nations War Crimes Commission, *Law Reports of Trials of War Criminals*, vol. I, Annex II, "United States Law and Practice Concerning Trials of War Criminals by Military Commissions and Military Government Courts," 112–14 London (1947) (hereinafter "U.S. Trials of War Criminals").

**26.** Control Council Law No. 10, *Punishment of Persons Guilty of War Crimes, Crimes Against Peace and Against Humanity*, Preamble (Dec. 20, 1945), in 3 *Official Gazette of The Control Council for Germany* 50 (Jan. 31, 1946). Also published in *Trials of War Criminals Before the Nuernberg Military Tribunals under Control Council Law No. 10*, vol. I, XVI (Oct. 1946–Apr. 1949).

**27.** Control Council Law No. 10, art. II(5) ("As an example, the IMT prosecuted crimes committed in connection with the Austrian Anschluss, effectuated in March 1938." Beth Van Schaack, *The Building Blocks of Hybrid Justice*, 44 Denv. J. Int'l L. & Pol'y 169, 246 (2016) (citing *Trial of German Major War Criminals, Judgment and Sentences*, (Int'l Mil. Trib.Nuremberg Oct. 1, 1946), 41 Am. J. Int'l L. 310, 318–21 (1947) ).

**28.** *See Report of the Deputy Judge Advocate for War Crimes, European Command June 1944 to July 1948* 58 (citing *United States v. Waldeck, et. al.*, opinion DAJAWC, Case No. 000–50–9 (Nov. 1947); *United States v. Brust*, opinion DAJAWC, Case No. 000–Mauthausen–7 (Sept. 1947) (U.S. military tribunals could try war criminals for offenses committed after the start of World War II but before the United States entered the war because "it is axiomatic that a state, adhering to the law of war which forms a part of the law of nations, is interested in the preservation and the enforcement thereof. And this is true irrespective of when or where the crime was committed, the belligerency or non-belligerency status of the punishing power, or the nationality of the victims."), http://www.loc.gov/rr/frd/Military_Law/reportDJA-war-crimes.html.

**29.** *See, e.g.,* Trials in Dachau, Germany: *United States v. Conzmann*, Case No. 000–012–1807 (Dec. 1946); *United States v. Haesiker*, Case No. 000–012–0489–001 (Oct. 16, 1947); *United States v. Hess et al.*, Case No. 000–012–1292 (Nov. 10, 1947); *United States v. Kaiser*, Case No. 000–012–2616 (Feb. 21, 1947); *United States v. Klaebe*, Case No. 000–012–2058 (June 23, 1947); *United States v. Krause*, Case No. 000–Buchenwald–42 (Feb. 27, 1948); *United States v. Kuhn*, Case No. 000–012–2804 (Mar. 21, 1947); *United States Merten et al.*, Case No. 000–012–2593 (June 13, 1947); *United States v. Ostenrieder*, Case No. 000–012–0027 (Feb. 21, 1947); *United States v. Polus*, Case No. 000–012–1160 (Dec. 1946); *United States v. Schlickau*, Case No. 000–012–

On October 18, 1946, the Office of Military Government (OMGUS) promulgated additional procedural rules in Military Government Ordnance No. 7 that deviated from court-martial practice.[30] Perhaps the most significant change from court-martial practice was the requirement that the fact finder for trials to "be [civilian] lawyers who have been admitted to practice, for at least five years, in the highest courts of one of the United States ... or in the United States Supreme Court." [31]

General of the Army MacArthur, Supreme Commander of the Allied Powers, issued *Regulations Governing the Trials of Accused War Criminals* (Dec. 5, 1945), which were known as "SCAP Regulations" for military commissions war crimes trials in the Far East.[32] Those U.S. military commissions were more like the traditional Civil War military commissions than the trials in Germany. For example, the "jury" or fact finder for the Far East trials were military line officers not attorneys.[33] The Far East military commissions were subject to the review under the habeas jurisdiction of the federal courts.[34] SCAP Regulation, ¶ 2(b)(2) provides for no statute of limitations, but indicates any offense can generally be prosecuted if it occurred around or after the start of hostilities involving Japan and any of the allies:

> The offence need not have been committed after a particular date to render the responsible party or parties subject to arrest, but in general should have been committed since or in the period immediately preceding the Mukden incident of September 18th 1931.[35]

The record of Far East military commission trials under SCAP regulations con-

2400 (Oct. 24, 1947); *United States v. Stoll*, Case No. 000–012–2313 (June 1, 1947).

**30.** Telford Taylor, *Final Report to the Secretary of the Army on the Nuernberg War Crimes Trials under Control Council No. 10* (Taylor Report) 28–29 (Aug. 10, 1949) (citing Military Government Ordnance Number 7, art. IIb) (explaining panels composed of civilian judges were needed because the panels would issue judicial opinions explaining their verdicts, and "judgments by professional, civilian judges would command more prestige both within Germany and abroad," among other reasons.).

**31.** *Id.*

**32.** U.S. Trials of War Criminals, *supra* note 25, at 113.

**33.** *See, e.g,* Colonel Howard S. Levie Collection, Press Release of General Yamashita's Assistant Defense Counsel, Major George Guy (Nov. 7, 1945) (tried by court composed of three major generals and two brigadier generals) on file at The Judge Advocate General's Legal Center and School, U.S. Army, Charlottesville, Virginia.

**34.** *See* U.S. Trials of War Criminals, *supra* note 25, at 121 (citing *Ex parte Quirin*, 317

U.S. 1, 63 S.Ct. 1, 87 L.Ed. 3 (1942); *In re Yamashita*, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499 (1946); *Homma v. Patterson*, 327 U.S. 759, 66 S.Ct. 515, 90 L.Ed. 992 (1946) ). More than three years elapsed between General Homma's May 6, 1942, refusal "to grant quarter to the armed forces of the United States and its allies in Manila Bay, Philippines" and the start of his trial in the Philippines in December 1945. *Id.* at 762 n. 4, 66 S.Ct. 515 (Rutledge, J., dissenting).

**35.** U.S. Trials of War Criminals, *supra* note 25, at 114–15. The Department of State Historian provides a description of the Mukden Incident of 1931. *See* Office of the Department of State Historian, Milestones: *1921– 1936 The Mukden Incident of 1931 and the Stimson Doctrine*, https://history.state.gov/ milestones/1921-1936/mukden-incident ("On September 18, 1931, an explosion destroyed a section of railway track near the city of Mukden. The Japanese, who owned the railway, blamed Chinese nationalists for the incident and used the opportunity to retaliate and invade Manchuria .... Within a few short months, the Japanese Army had overrun the region, having encountered next to no resistance from an untrained Chinese Army, and it went about consolidating its control on the resource-rich area. The Japanese declared the

tains several examples where the two-year statute of limitations under Article of War 39 was not applied to cases where more than two years elapsed from the date of the offense to arraignment or trial.[36]

In 1946, the Supreme Court denied habeas relief to General Yamashita, who was Commanding General of the Fourteenth Army Group of the Imperial Japanese Army, which had exercised control over the Philippine Islands the last year of World War II. *In re Yamashita*, 327 U.S. at 5, 13, 66 S.Ct. 340. General Yamashita was charged with violations of the law of war, and he "was found guilty of the offense as charged and sentenced to death by hanging." *Id.* at 5, 66 S.Ct. 340. In *Yamashita*, the Court addressed the authority of General Styer to refer General Yamashita's charges to trial under "detailed rules and regulations which General MacArthur prescribed for the trial of war criminals." *Id.* at 10–11, 66 S.Ct. 340. The Court addressed challenges to the jurisdiction of the military commission as follows:

> The trial and punishment of enemy combatants who have committed violations of the law of war .... is without qualification as to the exercise of this authority so long as a state of war exists—from its declaration until peace is proclaimed .... We cannot say that there is no authority to convene a commission after hostilities have ended to try violations of the law of war committed before their

cessation, at least until peace has been officially recognized by treaty or proclamation of the political branch of the Government. In fact, in most instances, the practical administration of the system of military justice under the law of war would fail if such authority were thought to end with the cessation of hostilities. For only after their cessation could the greater number of offenders and the principal ones be apprehended and subjected to trial.

No writer on international law appears to have regarded the power of military tribunals, otherwise competent to try violations of the law of war, as terminating before the formal state of war has ended. In our own military history there have been numerous instances in which offenders were tried by military commission after the cessation of hostilities and before the proclamation of peace, for offenses against the law of war committed before the cessation of hostilities. The extent to which the power to prosecute violations of the law of war shall be exercised before peace is declared rests, not with the courts, but with the political branch of the Government, and may itself be governed by the terms of an armistice or the treaty of peace.

*In re Yamashita*, 327 U.S. at 11–13, 66 S.Ct. 340 (internal citations and footnotes omitted).

The United States did not use military commissions during the Korean War, the

area to be the new autonomous state of Manchukuo, though the new nation was in fact under the control of the local Japanese Army.").

**36.** *See, e.g., United States v. Bando*, Case No. 035–2068–0001 (Aug. 15, 1947); *United States v. Ikeda*, Case No. 0035–2106 (Aug. 24, 1948); *United States v. Kondo*, Case No. 0035–0868–0001 (May 28, 1947); *United States v. Namba*, Case No. 0035–0267–0002 (July 2, 1948);

*United States v. Ogasawara*, Case No. 0034–0012–0001 (Nov. 17, 1947); *United States v. Murakami*, Case No. 0035–2110–0001 (Oct. 14, 1947). International Criminal Court website, Link–Allied Tribunals of the Far East, Link–United States of America, Link–Yokohama Trials, is the Internet location for the five trials of Japanese war criminals by the Eighth U.S. Army, https://www.legal-tools.org/en/browse/.

Vietnam War, or the Persian Gulf War. *See Hamdan*, 548 U.S. at 597, 126 S.Ct. 2749 (2006) (plurality opinion) ("The last time the U.S. Armed Forces used the law-of-war military commission was during World War II."). We have no examples of military commission trials after 1948. *See Al Bahlul*, 840 F.3d at 767–68.

**Customary International Law After 1968**

 We agree with the parties that customary international law is part of the law of the United States and supplies a rule of decision when no contrary domestic law exists. Appellant's Br. 22 & n. 21; Appellee Br. 48; Appellant Reply Br. 12. "Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation."[37] The MCM in effect on September 11, 2001, incorporated "international law." MCM (2000 ed.), pt. I, ¶ 2(b)(2) ("Subject to any applicable rule of international law or to any regulations prescribed by the President or by other competent authority, military commissions ... shall be guided by the appropriate principles of law and rules of procedures and evidence prescribed for courts-martial." *See also* MCM (2016 ed.) pt. I, ¶ 2(b)(2) (stating same).

 "[C]ustomary international law is part of the law of the United States to the limited extent that 'where there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations.'"[38] The parties presented no evidence that the United States has "formally acceded to or implemented any treaty or international instrument ... disallowing application of statutes of limitation [or agreeing to apply a specified statute of limitations] to all war crimes." *See* Appellant App. 421 (citations omitted). "While it is permissible for United States law to conflict with customary international law, where legislation is susceptible to multiple interpretations, the interpretation that does not conflict with 'the law of nations' is preferred. The Charming Betsy canon comes into play only where Congress's intent is ambiguous."[39]

The 1968 United Nations Convention on the Non–Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity,[40] entry into force on November 11, 1970, in accordance with article VIII, currently has 55 parties—not including the United States—primarily because many states were concerned about the expansive definitions of war crimes.[41]

The 1998 Rome Statute established the International Criminal Court (ICC), and

---

37. *Restatement of the Law (Third), Foreign Relations Law of the United States (Restatement)* § 102(2) (1987).

38. *United States v. Yousef*, 327 F.3d 56, 92 (2d Cir. 2003) (quoting *The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900)).

39. *Id.* (citing *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 2 L.Ed. 208 (1804); internal footnote omitted).

40. United Nations Convention on the Non–Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, 754

U.N.T.S. 73, *reprinted in* 18 I.L.M. 68 (1979), G.A. Res. 2391 (XXIII), U.N. Doc. A/7218 (1968).

41. U.N. Treaty Collection, Convention on the Non–Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, Status as of June 21, 2017. *See* Steven Ratner, Jason Abrams, and James Bischoff, *Accountability for Human Rights Atrocities in International Law*, (3rd ed., 2009), at 158–61. Al Baluchi App. 134–38. *See Handel v. Artukovic*, 601 F.Supp. 1421, 1430 (C.D. Cal. 1985) (noting the U.S. delegation did not express any reservations about an unlimited statute of limitations. "[T]he delegation had 'urged the

specifically prohibited statutes of limitation for war crimes tried before that court.[42] The Rome Statute has 139 signatories and 124 parties.[43] On December 31, 2000, the United States signed the Rome Statute of the International Criminal Court.[44] On May 6, 2002, the U.S. Government informed the Secretary–General of the United Nations "the United States does not intend to become a party to the treaty. Accordingly, the United States has no legal obligations arising from its signature on December 31, 2000."[45] Article 17 of the Rome Statute, also known as the "complementarity" provision, "provides that states

have the main responsibility for the adjudication of international crimes."[46] "[M]ost states' parties that still had domestic provisions on statutes of limitation to crimes within the jurisdiction of the ICC have abolished or amended them, although not all states' parties have done so."[47]

Judge Millet of the Court of Appeals for the District of Columbia Circuit cited the Rome Statute as a source for evidence of how the offense of joint criminal enterprise showed "its settled roots in international law."[48] "The Rome Statute as evidence of customary international law has limits. The Rome Statute .... is properly viewed in

Committee to reconsider whether it would not be better to return to the original purpose of this item—namely, to produce a convention limited simply to non-application of statutes of limitations to war crimes and crimes against humanity.' Press Release US–UN 161 (1968), October 9, 1968. Thus, while the United States did not sign the resulting convention, it appears to recognize the principle that a statute of no limitation should be applied to the criminal prosecution of war crimes and crimes against humanity.'').

42. Rome Statute of the ICC (Rome Statute), art. 29, July 17, 1998, 2187 U.N.T.S. 90. The statute of limitations provision in the Rome statute received careful scrutiny. In 1996, the Preparatory Committee on the Establishment of an International Criminal Court submitted its first report, containing five statutory limitation proposals. Mark Klamberg (editor), *Commentary on the Law of the International Criminal Court* 305, Torkel Opsahl Academic EPublisher Brussels (2017), FICHL Publication Series No. 29, https://www.legaltools.org/doc/aa0e2b/pdf/ (citing 1996 Report of the Preparatory Committee on the Establishment of an International Criminal Court, U.N. GA 51st Sess. Supp. No. 22, U.N. doc. A/51/22 (1996), vol. II, art. F). Article 29 of the Rome Statute states, *"Non-applicability of statute of limitations*—The crimes within the jurisdiction of the Court shall not be subject to any statute of limitations." *Id.* "The drafters of the 1998 ICC Statute eventually adopted the proposal of the Working Group, which is contained in Article 29. The only disagreement on

the statute of limitations provision can be found in the joint statement submitted by China and France in a footnote of the Working Group's Report." *Id.* at 306 (citation omitted).

43. U.N. Treaty Collection website, ch. XVIII, Penal Matters, 10. Rome Statute of the International Criminal Court as of June 21, 2017, https://treaties.un.org/Pages/ViewDetails. aspx?src=IND&mtdsg_no=XVIII-10&chapter=18&lang=en.

44. *Id.*

45. *Id.*; *See also Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 35–37 & n. 22 (D.C. Cir. 2011) (citing Letter of John R. Bolton, Under Sec'y of State for Arms Control and Int'l. Sec., to Kofi Annan, Sec'y Gen. of the United Nations (May 6, 2002) ).

46. Klamberg, *supra* n. 42, at 307.

47. *Id.* at 307–08 (discussing domestic statutory statute of limitation changes in France, Germany, and Netherlands after passage of the Rome Statute).

48. *Al Bahlul*, 840 F.3d at 791–92 (Millett, J., concurring) (citing Rome Statute Art. 25(3)(d), July 17, 1998, 2187 U.N.T.S. 90), *see also id.* at 814–816 (Rogers, Tatel, and Pillard, JJ., dissenting) (discussing Rome Statute in the context of the crime of conspiracy).

the nature of a treaty and not as customary international law." *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 35 (D.C. Cir. 2011) (citations omitted). In *Doe*, the Court of Appeals for the District of Columbia Circuit explained that the Rome Statute itself is limited authority for customary international law. Article 10 of the Rome Statute provides "that it is not to 'be interpreted as limiting or prejudicing in any way existing or developing rules of international law.' This acknowledges that the Rome Statute was not meant to affect or amend existing customary international law." *Id.* (citations omitted). The United States has not ratified the Rome Statute for reasons unrelated to the statute of limitations, and "the Rome Statute binds only those countries that have ratified it." [49] The ICC itself has recognized that the Rome Statute does not necessarily represent customary international law. *Id.* at 36–37 (citations omitted). [50] After considerable discussion, the Court concluded that the opinions of the International Criminal Tribunal for the Former Yugoslavia (ICTY) and the International Criminal Court for Rwanda (ICTR), and the Nuremberg tribunals "constitute expressions of customary international law[;]" however, "[t]he Rome Statute does not constitute customary international law." *Id.* at 39.

The Second Circuit has noted that "treaties . . . may constitute evidence of a norm of customary international law only if 'an overwhelming majority of States have ratified the treaty [51] and those States uniformly and consistently act in accordance with its principles.' " [52]

## Post–1990 International Tribunals

Tribunals after 1990 set jurisdictional limits based on the start of the genocide or hostilities. [53] The ICTY and ICTR Statutes contain provisions for jurisdiction beginning at the start of hostilities or genocide amounting to a statute of limitations. [54] The ICTY Statute states, "The temporal jurisdiction of the International Tribunal shall extend to a period beginning on 1 January

49. *Doe*, 654 F.3d at 35–36 (citations omitted). *See Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 276 & n. 9 (2d Cir. 2007) (noting that the Rome Statute of the ICC has been signed by most of the mature democracies of the world; however, the United States has not ratified it.); *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 374 F.Supp.2d 331, 339–40 (S.D.N.Y. 2005) ("[T]he United States feared 'unchecked power in the hands of the prosecutor' that could lead to 'politicized prosecution.' ").

50. *See also Restatement, supra* note 37 § 102(2); *Id.* § 102(3) ("International agreements create law for the states parties thereto and may lead to the creation of customary international law when such agreements are intended for adherence by states generally and are in fact widely accepted.").

51. *See also* Harold Hongju Koh, *International Law as Part of Our Law*, 98 Am. J. Int'l L. 43, 56 (2004) (noting some commentators suggest "that the practices of other mature democracies—not those that lag behind developmentally—constitute the most relevant evidence of . . . the 'evolving standards of decency that mark the progress of a maturing society.' ").

52. *Khulumani*, 504 F.3d at 325 n. 11 (quoting *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 256 (2d Cir. 2003) (Cabranes, J.) ).

53. This temporal limitation is consistent with Colonel William Winthrop's description of the traditional temporal limits of military commission jurisdiction, "[T]he offense charged 'must have been committed within the period of the war' "—that is, "[n]o jurisdiction exists [for a commission] to try offenses 'committed either before or after the war.' " *Hamdan*, 548 U.S. at 597–98, 126 S.Ct. 2749 (plurality opinion) (quoting 1920 Winthrop, *supra* n. 10, at 837–38).

54. Klamberg, *supra* n. 42, at 308.

1991."[55] The ICTR Statute states, "The temporal jurisdiction of the International Tribunal for Rwanda shall extend to a period beginning on 1 January 1994 and ending on 31 December 1994."[56] The "penal codes of the Former Yugoslavia and Rwanda provide for the non-applicability of statutes of limitation to international crimes."[57]

On January 16, 2002, the United Nations and the Sierra Leone Government jointly established the Special Court for Sierra Leone (SCSL) to adjudicate alleged crimes committed in Sierra Leone after November 30, 1996, the date Sierra Leone's president and the leader of Sierra Leone's Revolutionary United Front signed a peace agreement.[58] The jurisdiction of the SCSL is limited to crimes committed after November 30, 1996.[59] On June 6, 2003, the Cambodian Government and the United Nations reached an agreement, which entered into force on April 29, 2005, establishing the "Extraordinary Chambers for the Prosecution under Cambodian Law of Crimes Committed during the period of Democratic Kampuchea" to address the atrocities committed in Cambodia between April 17, 1975, and January 6, 1979, during the Khmer Rouge's reign.[60]

The parties contest whether under international law the statute of limitations for violations of the law of war is unlimited. Appellant Br. 11–12, 21–23; Appellee Br. 43–50; Appellant Reply 11–12. Various experts and scholars in international law opine that unlimited statutes of limitations do or do not constitute customary international law.[61] "In 2005, the International Committee of the Red Cross (ICRC),

**55.** Statute of the International Criminal Tribunal for the Former Yugoslavia, art. 8, U.N. Doc. S/25704 annex (May 3, 1993), adopted in S.C. Res. 827, U.N. Doc. S/RES/827 (May 25, 1993).

**56.** Statute of the International Tribunal for Rwanda, art. 7, *adopted by* S.C. Res. 955, U.N. Doc. S/RES/955 (1994), *reprinted in* 33 I.L.M. 1598.

**57.** Klamberg, *supra* n. 42, at 308.

**58.** *See* Zachary D. Kaufman, *The Nuremberg Tribunal v. the Tokyo Tribunal: Designs, Staffs, and Operations*, 43 J. Marshall L. Rev. 753, n. 36 (2010) (citing Mar. 6, 2002 letter from the Secretary–General, to the President of the Security Council, U.N. Doc. S/2002/246 (Mar. 8, 2002) (containing, in App. II, the January 16, 2002 Agreement Between the United Nations and the Government of Sierra Leone on the Establishment of a Special Court for Sierra Leone)).

**59.** Statute of the Special Court for Sierra Leone (SCSL), art. 1, SCSL Website, http://www.rscsl.org/Documents/scsl-statute.pdf.

**60.** *See* Report of the Secretary–General on the Khmer Rouge Trials, U.N. Doc. A/60/565

(Nov. 25, 2005), U.N. Doc A/59/432/Add.1 (Nov. 29, 2004). *See also* Special Rapporteur Sean D. Murphy, *Second Report on Crimes Against Humanity to U.N. General Assembly*, U.N. Doc. A/CN.4/690 ¶ 64 & n. 238 (Jan. 21, 2016) ("Similarly, the Law on the Establishment of Extraordinary Chambers in the Courts of Cambodia and the instruments regulating the Iraqi Supreme Criminal Tribunal and the Special Panels for Serious Crimes in East Timor all explicitly defined crimes against humanity as offences for which there was no statute of limitations."); U.N. Gen. Assembly Res., *Khmer Rouge trials* (May 22, 2003) art. 1, U.N. Doc. A/RES/57/228 B.

**61.** Klamberg, *supra* n. 42, at 311 (listing articles and indicating some "contemporary scholars remain hesitant in recogni[z]ing the existence of a rule of customary international law or general principle of law and rather speak of the 'crystalli[z]ation' of such a rule. Some consider the imprescriptibility of international crimes a rule of customary international law, or even *jus cogens*."). "Imprescriptibility" refers to the inapplicability of time limits to prosecution of an offense—i.e., an "imprescriptible" offense is one that cannot ordinarily become time-barred. Ruth A. Kok, *Statutory Limitations in International Criminal Law* 14 (2007); Jan Arno Hessbrugge,

which carried out an extensive study on customary international humanitarian law ... concluded in 2005 that "[s]tatutes of limitation are not applicable to war crimes." [62]

The Court of Appeals for the District of Columbia Circuit began the discussion of the applicability of international law in their analysis of whether Al Bahlul's prosecution for conspiracy was ex post facto stating:

> International law is important, and the political branches have good reason to adhere to international law when determining what offenses will be tried before U.S. military commissions. But international law has its own enforcement mechanisms. The federal courts are not roving enforcers of international law. And the federal courts are not empowered to smuggle international law into the U.S. Constitution and then wield it as a club against Congress and the President in wartime.

*Al Bahlul*, 840 F.3d 772–73. *See also Al–Bihani v. Obama*, 619 F.3d 1, 11 (D.C. Cir. 2010) (Kavanaugh, J., concurring) ("[C]ourts may not interfere with the President's exercise of war powers based on international–law norms that the political branches have not seen fit to enact into domestic U.S. law.").

In *Al Bahlul*, the parties agreed that conspiracy to commit war crimes was not an offense under the international laws of war at the time of Al Bahlul's offenses, *see id.* at 813 (Rogers, Tatel, Pillard, JJ., dissenting); however, the majority relied on two important military commission conspiracy cases, the trial of those charged with the assassination of President Lincoln, and more recently, the trial of the Nazi saboteurs in *Ex parte Quirin*, 317 U.S. 1, 63 S.Ct. 1, 87 L.Ed. 3 (1942) to establish that conspiracy was a preexisting offense for the purpose of the Ex Post Facto Clause. Like the majority in *Al Bahlul*, our focus must be on the statute of limitations applied in U.S. military tribunals, not on international tribunals after 1990, even though none of those tribunals limited prosecution to a specific time period after the offense.

### Procedural Equivalence Insofar as Practicable Between Courts–Martial and Military Commissions

In *Hamdan*, Justice Kennedy described the limitations in Article 36(b) on the President's authority to adopt military commission procedures:

> In this provision the statute allows the President to implement and build on the UCMJ's framework by adopting procedural regulations, ... the procedures may not be contrary to or inconsistent with the provisions of the UCMJ; and ... "insofar as practicable" all rules and regulations under § 836 must be uniform, a requirement, as the Court points out, that indicates the rules must be the

*Justice Delayed, Not Denied: Statutory Limitations and Human Rights Crimes*, 43 Geo. J. Int'l L. 335, 338 (2012).

**62.** Klamberg, *supra* n. 42, at 311 (citing Jean–Marie Henckaerts & Louise Doswald–Beck eds., *Customary International Humanitarian Law*, Int'l Comm. of the Red Cross, vol. II, ch. 43, § E at 614 (2005). *See Hamdan*, 548 U.S. at 619 n. 48, 126 S.Ct. 2749 ("The International Committee of the Red Cross is referred to by name in several provisions of the 1949 Geneva Conventions and is the body that drafted and published the official commentary to the Conventions. Though not binding law, the commentary is, as the parties recognize, relevant in interpreting the Conventions' provisions.").

same for military commissions as for courts-martial unless such uniformity is impracticable.

*Id.* at 640 (Kennedy, J., concurring). The Court indicated that "[n]othing in the record before us demonstrates that it would be impracticable to apply court-martial rules in this case." *Id.* at 623, 126 S.Ct. 2749 (plurality opinion). Based on the "absence of any showing of impracticability" under Article 36(b)—and the "undisputed [fact] that Commission Order No. 1 deviate[d] in many significant respects from [court-martial] rules"—the Court concluded that Commission Order No. 1 "necessarily violates Article 36(b)." *Id.* at 624, 126 S.Ct. 2749.

*Hamdan* directly addressed and limited the President's authority to create rules of procedure for military commissions. That decision did not address Congress's power to establish the statute of limitations. Congress clearly intended that the provisions of the 2006 and 2009 M.C.A. apply to the offenses retroactively without limitation as to time.[63]

In *Hamdan,* Justice Breyer suggested the President seek Congressional authorization for military commissions when those procedures are inconsistent with the UCMJ stating, "Indeed, Congress has denied the President the legislative authority [under Article 36, UCMJ] to create military commissions of the kind at issue here. Nothing prevents the President from returning to Congress to seek the authority he believes necessary." *Id.* at 636, 126 S.Ct. 2749 (Breyer, Kennedy, Souter, Gins-

burg, JJ., concurring). Shortly after the Supreme Court issued the *Hamdan* decision, the President and Congress responded to this invitation, and the 2006 M.C.A was enacted into law on October 17, 2006.[64] The 2006 M.C.A., amended Article 36, UCMJ to correct the procedural defects the Supreme Court had identified. *See* 2006 M.C.A., § 4(a)(3).

On October 28, 2009, Congress enacted the 2009 M.C.A. The 2009 M.C.A. in § 948b(c) repeated the same clarification of the scope of Article 36(b), UCMJ as follows:

> *Construction of provisions.* The procedures for military commissions set forth in this chapter are based upon the procedures for trial by general courts-martial under chapter 47 of the title (the Uniform Code of Military Justice). *Chapter 47 of this title does not, by its terms, apply to trial by military commission except as specifically provided therein or in this chapter, and many of the provisions of chapter 47 of this title are by their terms inapplicable to military commissions.*

10 U.S.C. § 948b(c)(emphasis added); *see also id.* § 948b(d)(2) ("Other provisions of chapter 47 of this title shall apply to trial by military commission under this chapter only to the extent provided by the terms of such provisions or by this chapter."). Currently, Article 36(b), UCMJ, states, "(b) All rules and regulations made under this article shall be uniform insofar as practicable, *except insofar as applicable to military commissions established under chap-*

---

**63.** *See Al Bahlul,* 767 F.3d at 12 ("Although we presume that statutes apply only prospectively 'absent clear congressional intent' to the contrary, that presumption is overcome by the clear language of the 2006 MCA.")(citations omitted).

**64.** *See Al Bahlul,* 840 F.3d at 771; *id.* at 827 (Rogers, Tatel, Pillard, JJ., dissenting); *Al Bahlul,* 767 F.3d at 13.

*ter 47A of this title.*" 10 U.S.C. § 836(b) (emphases added).

## Presumption of Constitutionality

 In our review of the constitutionality of Section 950v(b) of the 2006 M.C.A., and section 950t of the 2009 M.C.A., we are mindful of Justice Jackson's admonition: "An [action] executed by the President pursuant to an Act of Congress [is] supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635–37, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). Courts should "indulge the widest latitude of interpretation to sustain [the Commander in Chief's] exclusive function to command the instruments of national force, at least when turned against the outside world for the security of our society." *Youngstown*, 343 U.S. at 645, 72 S.Ct. 863 (Jackson, J., concurring).

The parties discussed extensively whether it is impractical to apply Article 43, UCMJ's five-year statute of limitations to law-of-war military commissions. Appellant Br. 27–36; Appellee Br. 37–42; Appellant Reply Br. 8–9. On September 6, 2006, President Bush sent the administration's proposed 2006 M.C.A. to Congress with this message:

> ... The draft legislation would establish a Code of Military Commissions that tracks the courts-martial procedures of the Uniform Code of Military Justice, but that departs from those procedures where they would be impracticable or inappropriate for the trial of unlawful enemy combatants captured in the midst of an ongoing armed conflict, under circumstances far different from those typically encountered by military prosecutors ....

H. Doc. No. 109–133, Cong. Rec. H6273 (Sept. 6, 2006). The President proposed that Congress amend Article 36, UCMJ to end any uniformity requirement between courts-martial and military commissions unless specifically required. The President explained why some deviations from court-martial procedures were practical necessities for military commissions:

> (1) For more than 10 years, the al Qaeda terrorist organization has waged an unlawful war of violence and terror against the United States and its allies. Al Qaeda was involved in the bombing of the World Trade Center in New York City in 1993, the bombing of the United States Embassies in Kenya and Tanzania in 1998, and the attack on the *U.S.S. Cole* in Yemen in 2000. On September 11, 2001, al Qaeda launched the most deadly foreign attack on United States soil in history. Nineteen al Qaeda operatives hijacked four commercial aircraft and piloted them into the World Trade Center Towers in New York City and the headquarters of the United States Department of Defense at the Pentagon, and downed United Airlines Flight 93. The attack destroyed the Towers, severely damaged the Pentagon, and resulted in the deaths of approximately 3,000 innocent people.

> (2) Following the attacks on the United States on September 11th, Congress recognized the existing hostilities with al Qaeda and affiliated terrorist organizations and, by the Authorization for the Use of Military Force Joint Resolution (Public Law 107–40), recognized that "the President has authority under the Constitution to take action to deter

and prevent acts of international terrorism against the United States" and authorized the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001 … in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons."

\* \* \*

(6) The use of military commissions is particularly important in this context because other alternatives, such as the use of courts-martial, generally *are impracticable.* The terrorists with whom the United States is engaged in armed conflict have demonstrated a commitment to the destruction of the United States and its people, to the violation of the law of war, and to the abuse of American legal processes. In a time of ongoing armed conflict, it generally is *neither practicable* nor appropriate for combatants like al Qaeda terrorists to be tried before tribunals that include all of the procedures associated with courts-martial.

(7) Many procedures for courts-martial would *not be practicable* in trying the unlawful enemy combatants for whom this Act provides for trial by military commission.

H. Doc. No. 109–133, § 2 (Sept. 7, 2006) (emphasis added). *See also id.* § 7 (noting "strict compliance with [rules of evidence limiting admissibility of hearsay] for evidence gathered on the battlefield *would be impracticable,* given the preeminent focus on military operations and the chaotic nature of combat.") (emphasis added).

## Conclusion

The 2016 precedent of the Court of Appeals for the District of Columbia Circuit in *Al Bahlul* guides our analysis, and we look to history for precedent on whether the U.S. military has traditionally applied the court-martial statute of limitations for military commissions trying law of war offenses. After reviewing Civil War and World War II precedent to determine whether conspiracy existed as a law of war offense before passage of the 2006 M.C.A. for ex post facto purposes, the Court stated, "The bottom line here is that the history matters, the history is overwhelming, and the history devastates the joint dissent's position." *Al Bahlul,* 840 F.3d at 773.

■ Turning to the statute of limitations from 1806 to 1950, the court-martial statute of limitations was two years; however, the two-year limit was not applicable to courts-martial if there was a "manifest impediment" to the accused being "amenable to justice within that period." The period of hostilities may have constituted such an impediment for law of war violations tried by military commissions or as Winthrop indicates, statutes of limitations in the Articles of War may not have applied to military commissions.

The most recent examples of U.S. trials of law of war offenses were in Germany and the Far East from 1946 to 1948. In those trials, a statute of limitations defense was not permitted. Numerous examples of such law of war cases are available that would have been barred under the two-year statute of limitations under Article of War 39, if those cases were tried by court-martial.

At the time of the UCMJ's adoption in 1950, Article 43(d)'s more specific exceptions, "in the custody of civil authorities" and "in the hands of the enemy" were adopted because they were preferable to

the more indefinite provision in Article of War 39 that the statute is tolled "when by reason of some manifest impediment the accused shall not have been amenable to military justice." [65] UCMJ Article 43 and its legislative history do not mention military commissions, prosecution of law of war violations, or trial of enemy combatants. We decline to read into Article 43, UCMJ, a requirement that its limitations apply to military commissions.

The 2009 M.C.A. § 949a(b) included a "practical need" statement:

> (b) *Exceptions.*—(1) In trials by military commission under this chapter, the Secretary of Defense, in consultation with the Attorney General, may make such exceptions in the applicability of the procedures and rules of evidence otherwise applicable in general courts-martial as may be required by the unique circumstances of the conduct of military and intelligence operations during hostilities or by other practical need consistent with this chapter.

10 U.S.C. § 949a(b). On August 14, 2012, the Secretary of Defense also made a practicability determination pursuant to the 2009 M.C.A. *See* M.M.C., pt. I, Preamble, ¶ 2 (2012):

> Departures from the rules of evidence and procedure applicable in trials by general courts-martial of the United States reflect the Secretary's determinations that these departures are required by the unique circumstances of the conduct of military and intelligence operations during hostilities or practical need consistent with chapter 47A, title 10, United States Code. Just as importantly, they provide procedural and evidentiary

rules that not only comport with chapter 47A of title 10, United States Code, and ensure protection of classified information, but extend to the accused all the judicial guarantees which are recognized as indispensible by civilized peoples as required by Common Article 3 of the Geneva Conventions of 1949.

There is no historical evidence that it was practical to prosecute law of war violations in the midst of hostilities with its "preeminent focus on military operations and the chaotic nature of combat." H. Doc. No. 109–133, § 7.

During hostilities, a statute of limitations applying a time limit to prosecute law of war violations is not practicable. More time to discover and investigate offenses, identify and apprehend suspects, make assessments of the intelligence value of information, and perfect a prosecutable case is necessary in a wartime situation.

The 2009 M.C.A. § 950t statement that crimes triable by military commission "shall be triable by military commission under this chapter at any time without limitation" was a statement of the law of war in existence from 1945 to 2009. Appellees failed to overcome the presumption of constitutionality of the statute of limitations in the M.C.A. Charges III and V do not violate the Ex Post Facto Clause of the U.S. Constitution.

The Military Commission Judge's decision to dismiss Charges III and V is reversed, and the case is remanded to the Military Commission Judge for proceedings consistent with this decision.

---

[65]. Senate Comm. on Armed Services, S. Rep. No. 486, 81st Cong., 1st Sess. (1949), *reprinted in* Index and Legislative History, *Establishing a Uniform Code of Military Justice* 19 (1950), Appellant App. 851. *See also United States v. Centeno,* 17 M.J. 642, 646–47 (N.M.C.M.R. 1983).